**SECURITY NATIONAL BANK,**
Plaintiff,

v.

**REPUBLIC NATIONAL LIFE INSUR-
ANCE COMPANY, Defendant.**

No. 72 Civ. 3914.

United States District Court,
S. D. New York.

Aug. 28, 1973.

Shea, Gould, Climenko & Kramer,
New York City (Ralph L. Ellis, New
York City, of counsel), for plaintiff.

Winer, Neuberger & Sive, New York City (David Sive, Sigmund Anderman, New York City, of counsel), for defendant.

BAUMAN, District Judge.

This action was commenced in the Supreme Court, New York County, and removed to this court on September 12, 1972. Defendant then moved pursuant to F.R.Civ.P. 12(b)(2) and 12(b)(4) to dismiss the complaint on the ground that the court lacked personal jurisdiction over the defendant or alternatively, to transfer the action to the U. S. District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1404(a). At the time of argument of the motion, I concluded that a factual hearing was necessary to clarify the question of jurisdiction. The parties thereafter undertook to develop a factual record and in the ensuing months conducted depositions and obtained affidavits from individuals involved in the transactions that underlie this lawsuit. The affidavits and deposition transcripts were submitted to the court, as well as a brief "Statement of Agreed Facts". I am now satisfied that there is an adequate record upon which to base a decision, and therefore deem a hearing unnecessary.

Although this is in essence a simple breach of contract action, some background is in order. Plaintiff is a national bank with principal offices in New York State. Defendant (hereafter "Republic"), is a life insurance company with principal offices in Dallas, Texas, primarily engaged in the sale of life, accident, and health insurance. It does not sell or solicit insurance, has no offices, employees or agents and has neither a bank account nor a telephone listing in the state. New York is, indeed, the only state in the union in which Republic does not sell insurance.

Like most large insurance companies,[1] Republic is accustomed to making substantial investments in debt and equity securities and in mortgage financing. During the early months of 1971, Erwin W. Atkerson, then chairman of the executive committee of Republic, had frequent conversations in Dallas with Morris Karp, then president of Realty Equities Corp. of New York (hereafter "Realty"), regarding investments in and loans to Realty by Republic. In July, 1971, Atkerson and Karp met on at least four occasions, and one such meeting lasted nearly two days. During these meetings they discussed the purchase by Republic from the Royal National Bank[2] of a note of the Charlotte Venture Corporation[3] in the principal amount of $2,000,000. This note, which was secured by a mortgage on a hotel in Charlotte, North Carolina, is the subject of the instant action. On July 29, 1971, Atkerson agreed, on behalf of Republic, to purchase the note from Royal, and, at Karp's suggestion, agreed to attend a meeting in New York on August 2 at which a variety of other transactions would be discussed.

On August 2 the meeting took place for some four or five hours at Realty's offices at 375 Park Avenue, New York City. Atkerson agreed, on behalf of Republic, to purchase a $5,000,000 note from Realty and/or its affiliated company, Graycrat Corporation. (This will be referred to hereafter as "the Graycrat note" to distinguish it from the Charlotte note, supra.) Atkerson made part payment of $2,000,000 for the note on that day, and agreed to pay the balance on August 5.

There was also further discussion of the Charlotte note at this meeting, al-

---

1. In 1971 Republic had an income of approximately $217,000,000 and issued approximately $2,000,000,000 of life insurance.

2. On May 5, 1972 Royal merged into the Security National Bank, the plaintiff in this action.

3. The Charlotte Venture Corporation is described in the statement of agreed facts as a company affiliated with Realty.

though no representative of Royal was present. Atkerson was told by representatives of Realty that "its financial circumstances required that prompt action be taken with respect to the Charlotte note and the additional payment of three million dollars and [was] asked that, for the convenience of Realty and others with whom it was dealing, Mr. Atkerson return to New York on August 5 at which time Realty would be consummating another transaction with another lender (The Royal National Bank.)"[4] Atkerson returned to Dallas that day and promptly drafted a letter setting forth the terms and conditions upon which Republic would purchase the Charlotte note.

He returned to New York on August 5, where, at Realty's offices, he gave to Realty's representatives a check for $3,000,000, which represented the balance due on the Graycrat note purchased on August 2.[5]

At the same meeting he delivered to Irving Stolz, representing Royal, the draft letter pertaining to the Charlotte note which he had prepared in Dallas. Stolz insisted that defendant agree to purchase the note and mortgage even if there were interest arrears on the purchase date.[6] After the changes had been agreed upon, certain phrases reflecting these modifications were immediately typed into the letter, which had previously been prepared on Republic's letterhead. The revised agreement was then executed by Atkerson on behalf of Republic and delivered to Stolz. Atkerson returned to Dallas that same day.

The agreement thus consummated between Royal and Republic had significance for a series of transactions between Royal and Realty. According to

the deposition testimony of Stolz, Realty, which had been borrowing from Royal since the early 1960's, had sought new loans from Royal to pay off certain obligations owing to Royal. Royal had been unwilling to extend them such loans unless it was assured that a responsible lender (i. e. a bank or insurance company) would undertake to purchase the Charlotte note and mortgage. Once Republic agreed to such an undertaking, Royal was willing to lend a Realty subsidiary, S. D. Associates, $3,350,139.70.

It is worth pointing out, therefore, that the contact between Royal and Republic was exceedingly limited. Royal had a business relationship with Realty of more than ten years' duration, and was involved with it in a series of complex transactions. Realty and Republic, in turn, had negotiated for some months over the two transactions already described (the $5 million Graycrat note and the $2 million Charlotte note). But there was no contact between Royal and Republic until August 5,[7] and on that date the contact was limited to the negotiations over interest arrears and the execution of the letter agreement.

In the letter agreement, prepared by Atkerson, Republic agreed to purchase the Charlotte note on August 1, 1972 or, at its option, on an earlier date. However, the complaint alleges that on said date Republic refused delivery of the note and its supporting documents and refused to make payment to the plaintiff as had been agreed in the Atkerson letter. The instant action was filed shortly thereafter.

I.

Republic now moves to dismiss the action, pursuant to Rules 12(b)(2) and

---

4. Statement of Agreed Facts, p. 2.

5. This check was immediately endorsed over to Royal pursuant to an agreement between Realty and Royal providing for the application of the proceeds of the check to pay two notes of Realty payable to two other banks. Each of these notes was secured by an irrevocable letter of credit issued by Royal,

and thus their payment discharged Royal of a contingent obligation.

6. Stolz deposition, p. 19.

7. Stolz testified (Stolz Deposition, p. 21) that prior to August 5 he had never met any officer or employee of Republic nor had he ever discussed the Charlotte note transaction with anyone from Republic.

12(b)(4) of the Federal Rules. These two provisions are, of course, intertwined, and the single question presented for resolution is whether Republic had sufficient contacts with New York to render it amenable to the service of process and thus to the jurisdiction of this court. Rule 4(e) of the Federal Rules provides that service may be effected in accordance with the rules prevailing in the state where the district court is situated. Reference must thus be made to § 313 of the C.P.L.R., which provides for the manner in which service may be effected on, inter alia, persons "subject to the jurisdiction of the courts of the state under section . . . 302." § 302(a)1 of the C.P.L.R.,[8] the so-called "long arm statute", provides that the courts of New York state may exercise jurisdiction over a non-domiciliary who "transacts any business within the state."

▮▮▮▮ Although Republic's activities within New York can hardly be deemed substantial, I am satisfied that they are sufficient to confer upon the courts of this state jurisdiction in this action. In so holding I am bound, as I must be, by the construction placed upon § 302(a)1 by the state courts. Bearing that in mind, my analysis must begin and end with the dictum of the New York Court of Appeals in Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970). There Chief Judge Fuld, speaking for the court, noted that "[t]he clearest sort of case in which our courts would have 302 jurisdiction" was "the situation where a defendant was physically present at the time the contract was made." 26 N.Y.2d at 17, 308 N.Y.S.2d at 340, 256 N.E.2d at 508. Judge Fuld cited Longines-Wittnauer Watch Co. v. Barnes & Reinecke, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965) and Harry Winston, Inc. v. Waldfogel, 292 F.Supp. 473 (S.D.N.Y.1968). In *Winston*, Judge Motley of this court stated: "[i]t is clear under the cases that if the contract were entirely executed by both parties in New York, personal jurisdiction could be obtained on that basis alone under § 302(a)(1)."[9]

Although it would thus appear that execution by both parties alone is sufficient to confer jurisdiction, I need not base my ruling on such a rigid and mechanical rule. For Republic's activities in New York amounted to more than the bare execution of the letter agreement on August 5. As has already been noted, Atkerson engaged in some prelim-

8. C.P.L.R. § 302(a):
"(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:
1. transacts any business within the state; or
2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
4. owns, uses or possesses any real property situated within the state."

9. It must be noted, however, that in United States v. Montreal Trust Company, 358 F.2d 239 (2nd Cir. 1966), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 rehearing denied 384 U.S. 982, 86 S.Ct. 1858, 16 L.Ed. 2d 693 (1966) our Court of Appeals stated that "The formal act of executing a contract in New York, by itself, may not be wholly determinative of the question of jurisdiction." 358 F.2d at 243. Because the ruling of a federal court under these circumstances is no more than a prediction of how a New York court will construe § 302, I am bound to follow the later holding in *Parke-Bernet*, although it appears directly contrary to that of the Second Circuit.

inary negotiations over the Charlotte note on both August 2 and August 5. On August 2 he discussed the transaction with representatives of Realty, although the record before me does not disclose the nature of these discussions. It is clear, however, that on August 2 he did agree to return on August 5 and reach final agreement with the representatives of Royal. Furthermore, on August 5 there were further negotiations with Stolz, representing Royal, over the question of interest arrears. These further discussions resulted in modifications of the agreement that Atkerson had previously prepared in Dallas.

Also worthy of mention in calculating Republic's contacts with this jurisdiction is its purchase of the $5 million Graycrat note from Royal, for which final payment was made on August 5. That transaction was apparently negotiated, at least in part, in New York, and was fully consummated here as well. Concededly, that was not the transaction out of which this cause of action arose. Nevertheless, it was part of an integrated series of agreements between Royal and Realty, and was described in detail in the "Closing Statement" recording the events of August 5 signed by Royal and Realty.

The foregoing account establishes that Republic was "present" in New York not solely by virtue of the signing of the letter agreement by Atkerson. I nevertheless am constrained to remark that but for the preeminent importance attached by the courts of New York to the actual execution of the agreement, this would be an extremely close case. The preponderance of the negotiations over the Charlotte note took place in Texas, between Karp and Atkerson, in July, 1971. Moreover, the agreement was to be performed in Dallas, by presentation of the note and supporting documents at Republic's office on August 1, 1972. Were I thus considering the matter unencumbered by precedent I might well be persuaded by the careful and sophisticated analysis of my colleagues in Northland

Paper Company v. Mohawk Tablet Company, 271 F.Supp. 763 (S.D.N.Y.1967) (Tyler, J.) and Chertok v. Ethyl Corporation of Canada, 341 F.Supp 1251 (S.D.N.Y.1972) (Edelstein, C. J.). In those cases the court considered not merely the locale of the negotiations, but such factors as the subject matter and the interests which the negotiations served. In neither of those cases, however, was the contract sued upon executed in New York. Because of the importance which this factor has assumed, I cannot be guided by those decisions. Accordingly, the motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(4) is denied.

## II.

Republic has in the alternative moved to transfer this action to the Northern District of Texas. It argues that all of its officers live in or around Dallas, Texas, that none of its expected witnesses live in New York, and thus the maintenance of this action here would work severe hardship. It also advances the argument that the case could be brought to trial much more quickly in the proposed transferee district. I need hardly add that this latter point has become a boilerplate passage in § 1404(a) motions made in the Southern District of New York.

I do not find these arguments persuasive, however, and, accordingly, the motion to transfer is denied. It is well settled that the plaintiff has a right to choose the forum, and that his choice should not be disturbed unless the movant demonstrates that the balance of convenience and justice weighs heavily in favor of transfer. Schmidt v. American Flyers Airline Corp., 260 F.Supp. 813 (S.D.N.Y.1966); Herbst v. Able, 278 F.Supp. 664 (S.D.N.Y.1967); Levin v. Mississippi River Corporation, 289 F.Supp. 353 (S.D.N.Y.1968). No such demonstration has been made here. Just as defendant's principal offices and witnesses are in Texas, those of the plaintiff are in New York and plaintiff will be just as inconvenienced by a

transfer to Texas as defendant purports to be by the maintenance of the action here. Under such circumstances, plaintiff's choice of forum must prevail. Franklin v. Blaylock, 218 F.Supp. 261 (S.D.N.Y.1963).

■■ Nor can I agree that a speedier trial will be available in the proposed transferee district. Relative calendar conditions are, of course, an important factor in a motion to transfer. Parsons v. Chesapeake & Ohio Railway, 375 U.S. 71, 84 S.Ct. 185, 11 L.Ed.2d 137 (1963). As I have observed elsewhere, the institution of the individual calendar system in the Southern District of New York has significantly reduced the time required for a case to reach the trial calendar. Indeed, the state of my own docket is such that any 1972 civil action can be brought to trial within a year of the filing of the complaint if the parties desire it. See A. C. Kluger & Co. v. Zammas, 72 Civ. 4529 (S.D.N.Y. June 13, 1973).

In conclusion, defendant's motions to dismiss for want of personal jurisdiction or in the alternative to transfer the action to the Northern District of Texas are denied.

So ordered.