(562 P.2d 142)
No. 48,185

ED PRATHER, *Appellee*, v. RAY W. OLSON, d/b/a Green Hills Cattle Management Company, *Appellant.*

Opinion filed March 25, 1977.

*James D. Howell, Jr.,* of Overland Park, and *Wilbur Pollard,* of Kansas City, Mo. for the appellant.

*M. C. Slough,* of Shawnee Mission, and *Douglas Lancaster,* of Wagner, Leek and Mullins, of Shawnee Mission, for the appellee.

Before HARMAN, C.J., REES and SPENCER, JJ.

HARMAN, C.J.: This is an action for an accounting under a written cattle lease. By way of sanction the trial court entered a default judgment against the defendant for his failure to comply with a discovery order. Defendant has appealed.

Points on appeal include the court's jurisdiction over the person of the defendant, the propriety of the sanction and the amount of the judgment awarded.

From the pleadings on file and the depositions of each of the parties the following appears. Plaintiff Ed Prather, an airline pilot who resided in Lake Quivera, Johnson county, Kansas, received information from two Lake Quivera neighbors about defendant Ray Olson and his tax shelter cattle leasing program in northern Missouri. One neighbor was Jeff Griffiths, Olson's accountant, and the other was Frank Brown.

Defendant Olson individually owned a livestock ranch near Browning, Missouri. He was president of Olson Cattle Co., Inc., which bought and sold livestock he ran on his ranch. He was also president of Milan Livestock Auction, a Missouri corporation which operated a livestock auction, and of Olson Order Buyers, a Missouri corporation which bought and sold cattle at the auction.

Early in 1971 plaintiff contacted defendant by telephone after learning of him through plaintiff's two neighbors and as a result purchased thirty head of heifers on March 16, 1971, through the Milan Livestock Auction. By letter dated May 3, 1971, Olson mailed Prather a copy of the bill of sale for these cattle. The stationery used by Olson contained the legend "Green Hills Cattle Management Co." Defendant Olson testified this was a name "dreamed up" by his accountant Griffiths for the cattle tax shelter program but Olson never went through with incorporation for it and instead carried on the operation himself. The May 3d letter also transmitted the cattle lease agreement which is the subject of this action and which Prather signed and returned to Olson for his signature. Briefly, this instrument provided for the leasing by Prather of thirty cattle to Olson for a period expiring December 1, 1971, for a rental of $426.45, such agreement to continue from year to year unless terminated by either of the parties with an annual rental of $600.00. The agreement provided that Olson should care for, feed and breed the cattle at his place of operation and should receive all progeny except those used as replacement for the original cattle. He was to have discretion to sell any original cattle, or their replacements, deemed undesirable, the funds derived therefrom to be reinvested in replacement cattle. Under the agreement the rented cattle were to be branded

or otherwise marked so as to make positive their identification and the owner was to have the right to make inspection of them.

Prather saw his cattle on three occasions on Olson's ranch. He received his 1971 rental money. Prather testified that in the early summer of 1972 he visited the ranch and saw heifers but no calves; Olson told him there were no calves because he had sold the original thirty cows and replaced them with heifers; Prather could see they weren't the original herd because they were no larger than those he had seen the year previously; he asked Olson for a bill of sale but Olson said that wasn't necessary for tax purposes and he furnished none; Olson paid Prather the $600.00 rental for 1972; Prather visited the herd in the summer of 1973 and again saw there were only heifers; in December, 1973, he requested termination of the agreement; Olson eventually gave him a check for $5,000; Olson had previously told him his replacement heifers were branded on the hips with the letter "P".

Olson testified in his deposition that he did not solicit Prather for the cattle program; form letters were printed for that purpose but none were supposed to have been sent out; he knew Prather through his accountant Griffiths; he had Prather's cattle branded; none of Prather's cattle died during the period or were replaced; he did not sell any of Prather's cattle and had them all in December, 1974; he had bought and sold other cattle off the ranch during 1972 and 1973 and had the records.

On June 3, 1974, plaintiff Prather commenced this action in the trial court, obtaining "long-arm" service pursuant to K.S.A. 60-308 (b) (1) and (5). Defendant Olson answered, among other things, challenging the court's jurisdiction over his person, and he also filed a counterclaim for expense incurred by him for feeding plaintiff's cattle after October, 1973. Thereafter both parties were deposed. On March 17, 1975, pursuant to K.S.A. 60-234, plaintiff requested production of defendant's 1971-1974 federal income tax returns, his records of cattle purchases and sales during 1971 through 1974 and requested permission for himself and his veterinarian to enter upon defendant's ranch for inspection of cattle identified by defendant in his December 10, 1974, deposition as plaintiff's cattle. When nothing was forthcoming plaintiff moved for an order to compel defendant to comply with the request previously made. On May 14, 1975, the trial court ordered defendant to comply with the request within

thirty days. Thereafter defendant's accountant furnished the requested tax records but records of cattle purchases and sales were never supplied.

On June 18, 1975, plaintiff and his veterinarian traveled to defendant's ranch to inspect the thirty cattle defendant had identified in his deposition as being branded with a "P" and approximately five years of age. Defendant produced only twenty cattle for inspection. The "P" brands on the cattle were in the opinion of plaintiff's veterinarian from six weeks to six months old at the time of inspection and the cattle were from three to eight years of age. No chute was provided by defendant for this inspection although one had been previously requested of defendant so as to make a meaningful inspection.

On July 3, 1975, plaintiff filed his motion for sanctions based on defendant's wilful noncompliance with the production order. On July 24, 1975, the court held a hearing on this motion. Plaintiff appeared and presented his version. Defendant appeared by his attorney only. Defendant offered no evidence at the hearing. On July 28, 1975, the trial court found that plaintiff's allegations were true, that defendant had failed to deny that the requested records existed or that he had control of them and that his failure to comply with the discovery order and the proffering of false and fraudulent evidence was wilful on his part. The court also ruled it had jurisdiction of defendant's person based on transaction of business within Kansas. It entered a judgment against defendant for $20,423.00. Defendant appealed from this judgment. Later he filed a motion to set aside the default judgment, alleging, in general terms only, mistake and inadvertence and that he had a meritorious defense. The record on appeal does not show disposition of this motion. Plaintiff states it was overruled but in any event we are not concerned with that motion.

We consider first the court's ruling that it had personal jurisdiction over defendant by reason of transaction of business in this state, pursuant to K.S.A. 60-308 (b) (1) and (5), which provide:

"(b) *Submitting to jurisdiction—process.* Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits said person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

"(1) The transaction of any business within this state;

"(5) Entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state. . . ."

In *White v. Goldthwaite,* 204 Kan. 83, 460 P. 2d 578, the court stated three basic factors which must coincide if such jurisdiction is to be exercised over a nonresident, as follows:

". . . (1) the nonresident must purposefully do some act or consummate some transaction in the forum state; (2) the claim for relief must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. . . ." (p. 88.)

Defendant asserts a single telephone call by plaintiff to him in Missouri and receipt by plaintiff in Kansas of defendant's rent checks are not sufficient activities to give jurisdiction to the Kansas court. The trial court had more than this upon which to base its ruling. There was testimony plaintiff learned of defendant's program through his Kansas neighbors. The court had before it a letter addressed to plaintiff's neighbor, Frank Brown, dated December 28, 1970, on "Green Hills Cattle Management Co." stationery, signed by Olson, which letter outlined Olson's cattle program and its tax advantages. The letter solicited Brown's investment. Endorsed on the top of the letter was this handwritten note: "Frank, This the deal I was discussing with you. Jeff." The inference is inescapable this note was from Olson's accountant, Jeff Griffiths. Griffiths, also plaintiff's Kansas neighbor, discussed the cattle program with plaintiff. It was he who, in defendant's parlance, "dreamed up" the name of defendant's tax shelter program. Defendant acknowledged he learned of plaintiff through Griffiths. Prior to signing the cattle lease plaintiff purchased cattle through Olson and made payment and received his bill of sale for them in Kansas. This transaction was part and parcel of the leasing agreement and its performance took place partially in Kansas. Payments under the lease were made in Kansas and the lease was twice extended past its original term by the assent of plaintiff, which can be said to have occurred in Kansas.

It seems clear the entire transaction was initiated through defendant's activity—by mail and by his accountant. Although

each case is to be determined on its own facts, solicitation by mail or by agents within a state for services to be performed in another state may be, and has been, held to be sufficient transaction of business within the state to support *in personam* jurisdiction over a nonresident defendant (see *Paulos v. Best Securities Incorporated,* 260 Minn. 283, 109 N.W. 2d 576; *Kugler v. Market Dev. Corp.,* 124 N.J. Super. 314, 306 A. 2d 489; *Schaffer v. Granit Hotel Inc.,* 110 N.J. Super. 1, 264 A. 2d 240; *Gregory v. Grove,* Okla., 547 P. 2d 381). And as pointed out certain aspects of the whole transaction were performed in Kansas. Overall the contacts in Kansas were much more numerous and significant than those in *Misco-United Supply, Inc. v. Richards of Rockford, Inc.,* 215 Kan. 849, 528 P. 2d 1248, relied upon by defendant for reversal.

We conclude the court's factual determination of personal jurisdiction was sufficiently supported by the evidence, that the activities of the parties brought defendant within the ambit of K.S.A. 60-308 *(b)* (1) and (5) and, under the circumstances, constitutional due process was not thereby offended.

Defendant asserts the trial court erred in imposing the ultimate sanction of entry of default judgment against him. He points out he furnished the tax records which were ordered, the order didn't require him to furnish a chute for cattle inspection and plaintiff was able to make some inspection. He seems to make much of the fact, according to him, that the cattle purchase and sale records were not in his possession. On this showing he contends he complied with the letter and spirit of the order and default judgment was too harsh under the circumstances.

K.S.A. 60-237 *(b)* authorizes a number of sanctions for the trial court's use against parties unjustifiably resisting discovery orders. Rendition of default judgment is one of them, respecting which, in *Lorson v. Falcon Coach, Inc.,* 214 Kan. 670, 522 P. 2d 449, it was held:

"The sanction of judgment by default for refusal to make discovery under K.S.A. 60-237 is the most severe sanction which a court may impose and its use must be tempered by the careful exercise of judicial discretion to assure that imposition thereof is merited. However, where there is evidence that a party has acted in deliberate disregard of reasonable and necessary orders of a court, and where such party is afforded a hearing and an opportunity to offer evidence of excusable neglect, the imposition of a stringent sanction will not be disturbed." (Syl. 3.)

In *Vickers v. City of Kansas City,* 216 Kan. 84, 531 P. 2d 113, it was further held:

"Where a party fails to comply with a production order in the course of discovery proceedings, the trial court is required in the exercise of its power of judicial discretion to determine which of the variety of available sanctions it will impose by its judgment. In making this determination the trial court should consider whether or not the documents to be produced go to a dispositive issue in the case, and whether the party seeking discovery may therefore be protected by the imposition of a sanction short of dismissal; and the court also should consider whether the party ordered to produce has failed to comply due to his inability to comply with the order, and not due to willfulness or bad faith." (Syl. 7.)

The real dereliction was defendant's failure to furnish the records of his cattle purchases and sales during the pertinent period. Although he seems to imply this was due to his inability to produce them, he conceded in his deposition and in his brief that he had access to them. The fact he was president of all the corporations involved leads to the conclusion he had "control" over them as that term is used in our production of documents statute (*see Williams v. Consolidated Investors, Inc.*, 205 Kan. 728, Syl. 2, 472 P. 2d 248). Defendant did not testify he was unable to produce the requested records. In fact at the hearing afforded him he offered no reason or excuse for his inaction nor did he request any extension of time. The documents sought went to a vital issue in the case, the purchase and sale of cows which may have belonged to plaintiff and upon which damages would be based. As indicated, this was information controlled by defendant. The trial court specifically found defendant's conduct to be wilful. Under the guidelines mentioned in *Vickers* it is difficult to see how lesser sanctions could be imposed to protect plaintiff. At the least we cannot declare abuse of discretion in the action taken.

Finally, defendant asserts the trial court erred in awarding the full amount of damages sought because there was insufficient evidence of loss suffered. We cannot agree. The court conducted a hearing on the entire matter. In its journal entry of judgment the court made specific reference to the depositions of the parties. The plaintiff's deposition, which was on file and of which the court was obviously aware, explained his calculation of damages. Admittedly he had no evidence of the exact date of sales of any of his cattle or the exact weight of the animals or the sales prices (this was information he had sought unsuccessfully to obtain). Essentially plaintiff testified his calculation began with defend-

ant's statement that in 1972 he had sold the original heifers purchased in 1971 and had replaced them with others as he had a right to do under the contract; plaintiff based his computations concerning normal growth and weight of the animals sold on information gleaned from individuals in the cattle business and his estimated profits on cattle market quotations in the *Kansas City Star.* He calculated the number of heifers which would then have been purchased from the proceeds, with a consequent increase in the herd. Similarly he made the same calculations with respect to the cattle sold in 1973 and replaced with other heifers. His bottom line figure after allowance of credits he conceded were due defendant was $18,023.00. In view of the foregoing we cannot say the court acted improperly. The court did not, however, take into account the $2,400 credit testified to by plaintiff but rendered judgment for $20,423.00, the amount prayed for in the petition. In *Lorson v. Falcon Coach, Inc.,* supra, the supreme court modified a default judgment rendered by way of sanction because of improper claim for one item of damages. Similarly, within *Lorson* guidelines, we think sanctions should not be imposed beyond any amount subsequently claimed by plaintiff in his testimony and therefore the judgment was excessive by $2,400 and must be so modified. As modified the judgment is affirmed.