**ENERGY RESERVES GROUP, INC., et al., Plaintiffs,**

v.

**The SUPERIOR OIL COMPANY and Superior Overseas Development Company, Ltd., Defendants.**

**Civ. A. No. 77–1318.**

United States District Court, D. Kansas.

Oct. 17, 1978.

Timothy E. McKee of Martin, Pringle, Schell & Fair, Clark R. Mandigo, II, Wichita, Kan., for plaintiffs.

Richard Jones, Jack D. Sage of Hershberger, Patterson, Jones & Roth, Wichita, Kan., Willard B. Wagner, Jr., Dan A. Spencer, The Superior Oil Co., Houston, Tex., for defendants.

## OPINION AND ORDER

THEIS, Chief Judge.

This matter comes before the Court on the motion of defendant Superior Overseas Development Company Ltd. (hereinafter "Superior Overseas") to dismiss this action pursuant to Rule 12(b)(2), Federal Rules of Civil Procedure, for lack of personal jurisdiction. This Court has previously disposed of two motions of defendant Superior Oil Company (hereinafter "Superior") in an order dated January 5, 1978, which set for hearing the instant motion of Superior Overseas. This hearing was held on January 19, 1978. Counsel for both sides were then granted additional time within which to file supplemental briefs on the personal jurisdiction question before the Court. Having examined the parties' briefs and having heard their oral argument, this Court finds that the matter is now ready for resolution.

This is a declaratory judgment action brought for common law breach of contract. Subject matter jurisdiction is predicated on the diversity statute, 28 U.S.C. § 1332(a). Both defendants are Nevada corporations. Superior has its principal place of business in Texas, and Superior Overseas has its principal place of business in London, England. Superior is authorized to do, and for many years has done, extensive business in

Kansas in the oil and gas industry. It appears that plaintiffs obtained service of process in Kansas on Superior's resident agent for service. Superior does not contest personal jurisdiction. Superior Overseas was served in Houston, Texas, pursuant to the Kansas long-arm statute. K.S.A. § 60–308(b) (1976), and Rule 4(e), Federal Rules of Civil Procedure.

The dispute between the parties arises from the contractual arrangements made by plaintiffs to finance the exploration, development and production of License P–244, which covers certain blocks in the North Sea area of the United Kingdom continental shelf. Plaintiffs hold a percentage working interest in the license which conveys rights for oil and gas exploration in the North Sea. Plaintiffs and defendants have entered into agreements to provide financing for the development of the Clinton interest in License P–244, to provide between the parties for the distribution of the earnings expected to flow from that development, and to provide for control of the voting rights attending plaintiffs' interest in the development of P–244.

Plaintiffs are allegedly under contractual obligations to the other owners of interest in the same areas. Plaintiffs allege that the defendants' refusal to participate in decisions made by the majority interest holders of P–244 has jeopardized the plaintiffs' license interest and has exposed plaintiffs to severe monetary penalties and possible forfeiture of their interest. Plaintiffs allege that defendants' failure to participate in the development of exploratory wells, in conformity with the majority vote of interest holders, is a material breach of their agreement with the defendants which excuses them from performance of their obligations under the contract. Plaintiffs allege in a separate count of their complaint that the defendants' conduct constitutes a default under the terms of the contracts and permits plaintiffs to terminate or rescind the agreements between the parties. Plaintiffs seek declaratory relief in a judgment ruling that the defendants' rights or interests under the contracts have terminated.

Superior Overseas has moved to dismiss on grounds of lack of personal jurisdiction. Superior Overseas has been served pursuant to the Kansas long-arm statute as one who has contracted with a Kansas resident for partial performance in the state. In the alternative, Superior Overseas has been served as one who transacts business in the forum through the agent or instrumentality of its parent corporation, Superior. Plaintiffs also allege that Superior Overseas is the mere "alter ego" of its parent and that jurisdiction over Superior, without more, provides jurisdiction over its absent subsidiary. Plaintiffs therefore urge this Court on corporate law principles to pierce the corporate veil between the two affiliated defendant corporations.

Defendants have responded that the two corporations have scrupulously maintained their separate corporate identities and that plaintiffs have demonstrated none of those facts necessary for a finding that the corporate veil may be pierced. Superior Overseas further contends that it lacks contacts with the forum sufficient to render proper this Court's exercise of jurisdiction over its person. Superior Overseas contends that it lacks *any* physical contact with Kansas and that its sole relationship with this forum is a signed contract which it mailed into the state for acceptance and final execution here by one of the plaintiffs. Superior Overseas strenuously argues that this sole act is insufficient to render the exercise of personal jurisdiction consistent with traditional notions of fair play and substantial justice as set forth in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

This Court cannot agree. Relying on the concepts of fundamental fairness and substantial justice, this Court is compelled to hold that personal jurisdiction over Superior Overseas is both authorized by statute and properly within the confines of the due process clause of the Fourteenth Amendment. This Court specifically de-

clines to reach the issue whether the corporate veil between the two defendants may be pierced. That issue may be appropriately reserved, if necessary, until the trial on the merits of this action. This Court today concludes that alter ego principles no longer play any proper role in the analysis of the constitutional propriety of the exercise of jurisdiction properly invoked by service authorized by statute. This Court further concludes that because of the broad wording of the Kansas long-arm statute, and because of the liberal interpretation to be given its literal reach, alter ego principles play no viable role in the construction and applicability of that statute and consequently do not restrict those who might be reached for service thereunder.

■ The Court thus decides two jurisdictional questions. The Court first holds that the long-arm statute, which authorizes service on anyone who commits certain acts "through an agent or instrumentality," permits service of process on a non-resident corporation which has in the forum an affiliated corporation that has committed one of those acts at the direction or for the benefit of the non-resident corporation. The statutory language "agent or instrumentality" extends service beyond non-resident corporations who act merely as "alter egos" of an affiliated corporation in the forum and thus permits service on the non-resident corporation without a determination whether the corporate veil might be pierced. This Court concludes that the Kansas legislature did not intend to restrict the reach of the long-arm statute only to those who commit the enumerated acts through a corporate "alter ego," a concept which derived from principles of corporate law unrelated to the limitations on quasi-sovereign states to issue service of process beyond their territorial borders.

■ The Court secondly holds that formal separation of corporate identities does not raise a constitutional barrier to the exercise of jurisdiction over a non-resident whose affiliated corporation has a substantial nexus with the forum. This follows from the conclusion that the time-honored doctrine of *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), must no longer be followed. The Court finds *Cannon* to be limited in scope or modified in holding by *International Shoe* and its progeny. Reliance on the rule of *Cannon* is unsound when extraterritorial service is authorized by statute and when personal jurisdiction is predicated on the due process standards of *International Shoe.*

■ The Court concludes that the constitutional analysis under *International Shoe* permits consideration of a non-resident's relationship with an affiliated corporation in the forum, notwithstanding their proper maintenance of separate corporate identities. The Court may also consider as "affiliating circumstances" with the forum the contacts or activities of the affiliated corporation itself where those activities are intended to bestow a benefit upon the non-resident corporation that the latter has purposefully sought or might reasonably foresee. The relative significance of these factors are dependent upon the facts of each given case. They assume greater significance where, as here, the domestic corporation's activities are substantially related to the obligations giving rise to plaintiffs' claims against the non-resident subsidiary corporation. The Court considers these contacts relevant to any realistic judgment of the relative fairness of requiring Superior Overseas to defend itself in this forum on the contracts in question. It considers these activities of the parent corporation notwithstanding any lawful and viable separation of corporate identities maintained between the defendants.

■ The Court therefore finds personal jurisdiction over Superior Overseas proper on two grounds. Because of the relationship and conduct established between the parent and subsidiary corporation regarding the contracts in question, the Court may properly conclude that Superior Overseas has transacted business in this forum through the instrumentality of its parent corporation, Superior. Service of process is therefore proper under K.S.A. § 60-

308(b)(1). The Court further finds that Superior Overseas has contracted with a Kansas resident for partial performance in the state, thus furnishing the basis for authorized service under K.S.A. § 60–308(b)(5). The exercise of the jurisdiction so invoked is constitutionally unobjectionable when supported by the relationship of Superior Overseas with its parent in the forum and by the activities of Superior in the forum that foreseeably inured to its subsidiary's benefit. Further considerations regarding the fair and orderly administration of the laws, as mandated by *International Shoe*, compel this Court to conclude that the exercise of jurisdiction here is not inconsistent with the requirements of the Fourteenth Amendment as enunciated in *International Shoe* and *Shaffer.*

## FACTUAL BACKGROUND

The facts of the instant case that are material to the jurisdictional issue are not substantially in dispute. All parties place great reliance on similar factual developments to reach opposite conclusions on the propriety of jurisdiction. Before developing that factual background, however, the Court must detail the elaborate and complex intercorporate relationships which give rise to the contracts in question and which identify each of the parties before the Court.

Plaintiff Energy Reserves Group, Inc. is the successor corporation of the Clinton Oil Company, and the rights and obligations of the two are the same with regard to the issues in this action. For the sake of simplicity and clarity in the discussion of the contracts in question, Energy Reserves Group, Inc. is hereinafter identified as "Clinton." It is a Delaware corporation with its principal place of business in Kansas. Plaintiff Clinton International Corporation (hereinafter "Clinton International") is also a Delaware corporation with its principal place of business in Kansas. Clinton owns 90% of the outstanding capital stock of Clinton International, and Richard Volk, who testified at the hearing on the instant motion, is president of both corporations.

Plaintiff Clinton International (England) Ltd. (hereinafter "Clinton England") is a wholly owned subsidiary of Clinton International and has its principal places of business in Kansas and London. A related corporation, but not a party here, is Clinton International North Sea Ltd. (hereinafter "Clinton North Sea"), also a wholly owned subsidiary of Clinton International and a corporation organized under the laws of the United Kingdom.

As noted above, Superior is a Nevada corporation which has done extensive business in Kansas in the oil and gas industry. It is authorized to do business here and it owns numerous interests in oil and gas fields in the state. Its principal place of business is in Houston, Texas. Superior Overseas is also a Nevada corporation and a wholly owned subsidiary of Superior and has its principal place of business in London.

Clinton North Sea was the owner of the P–244 license interest in offshore oil development which is the subject of this controversy. Clinton North Sea owned that interest subject to the terms of an operating agreement with the other percentage interest holders in the same license. In a contract in March, 1972, Clinton North Sea agreed to transfer to Clinton England a substantial beneficial interest in the proceeds from the license development. Clinton England essentially agreed that it would perform and discharge all the obligations of Clinton North Sea under the latter's license, subject to the operating agreement which Clinton North Sea had signed with the majority percentage interest holders of the same license.

This type of intercorporate organization is apparently common in the international industry of oil and gas exploration, development and production. For purposes of tax advantages it is deemed advisable to have a separate foreign corporation own the license interest for oil development. The Court was also informed at the hearing that the laws of the United Kingdom, as well as those of many other foreign countries, require or encourage the holders of oil license

492

interests to be domestic corporations of the particular nation. Clinton North Sea is such a corporation. Clinton International is a holding company specifically designed to own Clinton's various foreign oil companies that hold licenses for oil exploration in different countries around the world. Clinton International is, of course, a subsidiary of Clinton and they both share the same offices in Kansas. In this manner Clinton itself ultimately retains control over its percentage interest in the P–244 license in the North Sea area. Mr. Volk also indicated that in a like manner Clinton controls other licenses in different countries around the world.

As the defendants have illustrated in an exhibit before the Court, Clinton sought financial backing to develop:

"[its] holdings in the North Sea . . . [permitting Clinton] through its subsidiary Clinton International . . . [to] participate in the drilling of a well . . in the United Kingdom sector of the North Sea."

(Clinton Oil Company, Letter to Shareholders, Defendants' Exhibit A.)

Superior first offered that financial backing. Joe Reid, Vice President of Superior and President of Superior Overseas, first telephoned Volk from Houston, Texas, in September, 1973, to explore the possibilities of participation in Clinton's interest in P–244 in the North Sea area. Reid expressed an interest in meeting Volk regarding Clinton's North Sea interests, and Reid traveled to Wichita, Kansas, and met with Volk on October 31, 1973. Reid signed into the office as a representative of Superior. Negotiations continued between the two corporations and culminated in a meeting in June, 1974, between Volk and Reid in Houston, where both parties reached an agreement regarding Superior's participation in the North Sea development.

Volk's notes from that meeting reflect that he and Joe Reid, of Superior, agreed that "Superior assumes Clinton's full obligation" for exploration, production, and development under Clinton's license interests. Superior received as consideration for financing the project a "call on Clinton's share of the oil." The notes further reflect that:

"Clinton will assign its interest in the license to Superior or, if possible, sufficient ownership of the subsidiaries holding title and the illustrative agreement to enable Superior and Clinton to take full advantage of the tax laws of the countries involved."

(Plaintiffs' Exhibit No. 2, Plaintiffs' Brief in Opposition to Defendants' Motion.)

Following the meeting a "letter of intent" was mailed by Mr. Clark, as senior vice president of Superior, to Volk, as president of Clinton. In essence, the letter was a contract to enter into a further and more detailed contract at a later date. It stated:

"Subject to entering into a more detailed and definitive agreement within 30 days from today and being subject to Superior acquiring acceptable U.K. ownership in the licenses or Superior acquiring acceptable ownership of the subsidiary holding title to the licenses, *Superior is willing to do the following.*" (Emphasis added.)

The letter then set forth terms substantially the same as those which Volk's notes had indicated to be the agreement reached in Houston. This "letter of intent" contained an acceptance block which Volk signed as President of Clinton on July 1, 1974. The time limitation of the "letter of intent" was later extended beyond the initial thirty-day period in a separate agreement signed by Reid and Volk representing Superior and Clinton.

Throughout the entire negotiations Superior and Clinton significantly bargained over "Clinton's interest" in P–244, "Clinton's obligations" and "Clinton's rights" to proceeds thereunder. Superior initially contacted Clinton to inquire about its participation in "Clinton's interest" in the North Sea area. Every step of these negotiations reflects in substance the arrangements of two parent corporations to dispose of certain rights and duties. Clinton, of course, did not own any interest in, nor did it have any rights to or obligations under the United Kingdom license and operating

agreements. Clinton North Sea and Clinton England held those interests, rights and obligations. Both of these corporations were owned by Clinton International, which, in turn, was owned by Clinton. It is also apparent that Superior was aware of these facts. Superior's "letter of intent" clearly contemplated that Clinton would cause its subsidiaries to transfer to Superior an interest in the license itself, or that Clinton would cause Clinton International to transfer to Superior "acceptable ownership" of Clinton England and Clinton North Sea. In a similar regard, Clinton was advised by Reid that Superior would likely not itself accept such ownership or title, but rather would place it in a foreign subsidiary for tax purposes. Clinton was, therefore, likewise on notice that the ultimate execution of the arrangements with Superior would likely be achieved through the employment of subsidiary corporations.

Two contracts ultimately arose from these and further negotiations between the two parent corporations. The contract anticipated in the "letter of intent" was executed October 29, 1974, and was identified by the parties as the "letter agreement" of that date. On the same day each company's subsidiary, Clinton England and Superior Overseas, entered into a contract referred to as the "Main Agreement." The "letter agreement" constituted a binding bilateral contract wherein both parent corporations exchanged promises of performance on their own behalf and on behalf of their subsidiaries. The "letter agreement" was signed by Superior in Texas and was accepted and finally executed both by Clinton and by Clinton International in Kansas on October 31, 1974. Superior Overseas was not a party to this contract, nor was Clinton England or Clinton North Sea.

A cursory review of the terms of the instant contracts is in order. In a document known as the "Illustrative Agreement," Clinton England contracted with Clinton North Sea, the English subsidiary holding title to the P–244 license, to provide the funds and equipment necessary for the exploration, production and development of the license interest in conformity with the operating agreement between all percentage holders of the interest. In exchange, Clinton England received a five-sevenths interest in the 25% working interest of Clinton North Sea in P–244.

Under the Main Agreement, Clinton England contracted with Superior Overseas to obtain assistance in discharging its obligations under the "Illustrative Agreement" to develop the P–244 license. Superior Overseas agreed to provide the funds and equipment required of Clinton England to develop P–244 under its contract with Clinton North Sea. After Superior Overseas' recoupment of its initial outlay, both Superior Overseas and Clinton England were to share equally in the expenses and the proceeds under the license interest. The contract stated that all notices and communications required under the agreement must be mailed to specified offices of Superior Overseas, Clinton England, and to the Kansas office of Clinton International. The Main Agreement contract substantially controlled the flow of funds to and from plaintiff Kansas corporations, and further required substantial communication with corporations in this form, i. e., Kansas. This is the sole partial performance contemplated under the contract which has any physical connection with this forum.

The "letter agreement" between Superior, Clinton and Clinton International added material terms to the Main Agreement between the two subsidiaries. Each subsidiary gained rights and obligations under this contract although the subsidiaries themselves were not parties to the contract. Rather, they were committed under this letter agreement to the performance of certain obligations undertaken "by [them] or by the parties hereto for and on behalf of their respective . . . subsidiaries." The contract was executed by Superior in Houston and by Clinton and Clinton International in Kansas.

The letter agreement between the parents, for example, stated that "it is agreed between our companies and our respective affiliates and subsidiaries . . . " that

Clinton England must assign to Superior Overseas on request a percentage interest in P–244. Clinton England became bound to vote as a member of the operating committee as Superior Overseas demanded. Superior Overseas assumed responsibility for a specific percentage of the costs incurred in the drilling of two initial exploratory wells. Certain default provisions were added which may be material to the dispute here between the subsidiaries. Provisions were also made between the parents for an accounting of the proceeds of petroleum accruing both to Clinton England and Superior Overseas.

Beginning at paragraphs five and six of the contract, Clinton and Clinton International expressly promised that they would "cause Clinton England . . . [and] Clinton North Sea" to undertake various activities. They authorized Superior Overseas "on behalf and in the name of Clinton North Sea or Clinton England" to take any action necessary to maintain the license interest, provided notice was first given to Clinton and Clinton International. Clinton International agreed to permit Superior Overseas to designate 50% of the members of the Board of Directors of both Clinton England and Clinton North Sea. Clinton International also agreed that upon certain conditions, either it would transfer to Superior Overseas half-ownership of Clinton North Sea and cause Clinton England to assign a one-half interest in its license, or it would cause Clinton North Sea to assign to a corporation designated by Superior Overseas a one-half interest in the license. The parents lastly guaranteed the performance of the obligations imposed on their subsidiaries under this letter agreement to which the subsidiaries were not party.

The record before this Court makes it clear that underlying all these transactions is a bargain between two parent corporations to control and develop a license interest in North Sea oil operations. For reasons of tax advantage and compliance with foreign law, both parents chose to proceed in their endeavors through subsidiary corporations. Clinton held the license in its subsidiary corporation, Clinton North Sea, but Clinton's exploitation of that interest was arranged through its chain of corporate ownership. Clinton desired assistance from other companies to develop its license. Superior offered this assistance with the announced intention of either receiving part ownership of the Clinton subsidiaries or accepting and placing partial ownership of the license interest in a Superior subsidiary. Ultimately, Clinton's subsidiaries conveyed certain rights to Superior's subsidiary which, in exchange, promised the financial and mechanical support required to develop those rights. Each subsidiary acted in reliance upon the representations and guarantees of the parent corporation controlling the respective subsidiary.

It is even more indubitably clear that the agreement at the subsidiary level was bargained for and agreed upon at the parent level by the officers of the parents acting on behalf of both the parent corporations and their subsidiaries. Indeed, there is not a scintilla of evidence in the record to show that the subsidiaries *ever* negotiated directly between themselves independently of their parents' negotiations. Both parents caused their subsidiaries to enter into a contract at the subsidiary level. The parents conducted their negotiations on behalf of the subsidiaries. The parents further contracted between themselves to cause their subsidiaries to perform in a certain manner under the subsidiaries' contract. The parents contracted between themselves that they would cause their subsidiaries to perform additional obligations imposed on the subsidiaries by the parents' contract to which the subsidiaries were not party. Indeed, the very ownership of the Clinton subsidiaries, and the right to elect the directors of those subsidiaries, were main elements in the bargaining between the parents.

The element of control established here by the parent corporations over their subsidiaries is as substantial as it is vivid. This Court relies on this fact for two alternative purposes. The Court finds the intercorporate relationship sufficient to hold that Su-

perior Overseas has transacted business in the forum through the instrumentality of a parent corporation that conducted contractual negotiations in the forum on its behalf. Although Superior purportedly represented only itself during its business in Kansas, it is clear that Superior intended, and that Superior Overseas understood, that the subsidiary would receive the benefit of the contractual negotiations. Without examining whether this relationship might support a finding of traditional agency or corporate control sufficient to "pierce the corporate veil," this Court concludes that the purposeful activity of Superior in the forum on behalf of its subsidiary is sufficient to render it the "instrumentality" of its subsidiary within the meaning of the long-arm statute.

Having found that Superior Overseas is subject to service of process, both under subsections (b)(1) and (b)(5) of the Kansas long-arm statute, the Court secondly relies on this factor of control to give substantial weight to those contacts of Superior with this forum which are intimately connected with plaintiffs' claims. This consideration is but one of several which support the conclusion that the exercise of personal jurisdiction so invoked satisfies the constitutional test of fundamental fairness and substantial justice. Personal jurisdiction over Superior Overseas is therefore proper.

## DEVELOPMENT OF THE RULE OF CANNON

Superior Overseas has argued extensively that all preliminary negotiations on the instant contracts were undertaken by its parent, Superior. Superior Overseas resists the attribution of Superior's contacts with this forum, and argues that personal jurisdiction may not be constitutionally predicated on the single contact of Superior Overseas with Kansas—a contract substantially governing the rights and duties of two subsidiary corporations in oil drilling operations in the North Sea area of the United Kingdom. Superior Overseas argues that the plaintiffs may prevail only upon showing that the corporate veil between the defend-

ant corporations may be pierced, that the subsidiary corporation is the mere "alter ego" of the parent, and that this Court may therefore treat the two as one and consider the parent's relationship with this forum in order to establish jurisdiction over the nonresident subsidiary. Defendants rely heavily on the rule of *Cannon Mfg. Co. v. Cudahy Packing Co.*, supra, as adopted and applied by Kansas in *Farha v. Signal Companies, Inc.*, 216 Kan. 471, 532 P.2d 1330, modified, 217 Kan. 43, 535 P.2d 463 (1975).

Plaintiffs argue to the contrary on these same facts. Superior and Superior Overseas have substantially the same officers and directors. Mr. Reid, who primarily negotiated the instant contracts, was an officer of both corporations. Superior did all the bargaining on the instant contracts and "held itself out" as the real party behind the subsidiary's contract. Superior thereby led plaintiffs to believe that they were in fact dealing with Superior, and the plaintiffs relied on that belief. Plaintiffs argue that Superior Overseas was used at the last moment as the "mere instrumentality" or "alter ego" of its parent corporation in order to effectuate the ultimate goal of Superior's negotiations. Plaintiffs therefore urge this Court to pierce the corporate veil between the two corporations and exercise jurisdiction over the non-resident subsidiary by virtue of this Court's conceded jurisdiction over the parent corporation in this forum.

As stated previously, this Court finds it unnecessary to reach the issue whether on these facts it might permissibly pierce the corporate veil and find Superior Overseas to be the "alter ego" of its parent, Superior. The Court finds, instead, that the rule of *Cannon* is no longer viable in jurisdictional analysis. While the rule of *Cannon*, and alter ego analysis generally, may in some situations retain statutory value, they *no longer* have any bearing on the constitutionality of jurisdiction over a defendant who is properly served.

*Cannon* was decided in a context where extraterritorial service of process on a nonresident corporation was statutorily unau-

thorized and constitutionally restricted by the old notions of territorial power limitations on a state's ability to issue service beyond its borders. *Cannon* therefore imposed merely a statutory obstacle to service on a non-resident corporation on the basis of its subsidiary's business in the forum. That statutory obstacle, however, was reflective of the constitutional obstacle to extraterritorial service then extant under the territorial due process constraint that a state might exercise jurisdiction only over those persons present in the forum. The decision in *Cannon* represented merely one of many cases that defined the parameters of a non-resident corporation's "doing business" within the forum sufficient to warrant the inference that the non-resident corporation was "present" and therefore amenable to domestic service of process in the forum.

After the decision in *International Shoe*, the "presence" of a non-resident, as measured under the old quantitative "doing business" standard, was no longer necessary to a state court's exercise of personal jurisdiction over that non-resident. The rule of *Cannon* thus lost its constitutional significance when extraterritorial service of process was authorized by statute and when the constitutionality of the exercise of the jurisdiction so invoked was measured under the new qualitative fundamental fairness test of *International Shoe*.

After the recent decision in *Shaffer*, the "presence" of a non-resident in the forum is neither necessary nor sufficient to render constitutional the exercise of jurisdiction, whether invoked pursuant to extraterritorial service on the non-resident or domestic service on the non-resident's designated agent for service of process. All exercise of state court jurisdiction, and impliedly the exercise of personal jurisdiction in federal court pursuant to Rule 4(d)(7) or 4(e), must be analyzed under the standards of *International Shoe*. Reliance on the rule of *Cannon* to determine a non-resident's "presence" is therefore no longer relevant to the proper inquiry into whether the exercise of personal jurisdiction offends tradi-

tional notions of fair play and substantial justice, notwithstanding the non-resident's presence or lack thereof in the forum. With the demise of the territorial power theory of state court jurisdiction, and the concomitant demise of the necessity or sufficiency of "presence" as a precondition to the exercise of personal jurisdiction, the rule of *Cannon* no longer plays a viable role in jurisdictional analysis. A review of the context in which *Cannon* was decided is necessary.

The decision in *Cannon* predates *International Shoe* by twenty years and falls among those cases that examined whether a corporation was "doing business" in the forum and therefore "present" there. Although often cited for the proposition that the mere presence of a subsidiary corporation within a state does not provide a basis for personal jurisdiction over a non-resident parent corporation, *Cannon* specifically held that the business of a subsidiary in the state did not constitute sufficient "doing business" in that state by the parent to warrant an inference of the parent's "presence" there. Thus, local service of process on the domestic subsidiary was held insufficient as a means to invoke jurisdiction over the non-resident parent. The narrowness of this holding, and the jurisdictional context in which it arose, are crucial to an understanding of the propriety of jurisdiction when invoked under modern long-arm statutes.

*Cannon* was a breach of contract action where a North Carolina corporate plaintiff brought suit against Cudahy Packing Company, a Maine corporation, and against Cudahy of Alabama, a wholly-owned subsidiary of Cudahy, and the "instrumentality employed to market Cudahy products within the state." *Cannon*, supra, 267 U.S. at 335, 45 S.Ct. at 251. The subsidiary acted in a role not uncommon to many present distributorship arrangements. The subsidiary bought products from its non-resident parent and in turn sold them to dealers within the forum. All the products, however, were shipped by Cudahy directly to the buyers in North Carolina, where the

subsidiary would collect the purchase price. The subsidiary, however, was not found to be the agent of its parent, and the Court found that the subsidiary was both financially and commercially preserved as a distinct corporate entity in all respects. Although the parent completely dominated and controlled the subsidiary, "the corporate separation, though perhaps merely formal, was real. It was not pure fiction." 267 U.S. at 337, 45 S.Ct. at 251.

At the time *Cannon* was decided, plaintiff could only invoke jurisdiction over the non-resident parent corporation by finding it "present" in the forum. Domestic service was had on the subsidiary alone, and although the Court stated that the claim for jurisdiction was not based on any state statute, the Court referred to the non-existence of a statute that specifically authorized service based on the presence of a subsidiary corporation in the forum. See *Empire Steel Corp. v. Superior Court*, 56 Cal.2d 823, 830, 17 Cal.Rptr. 150, 154, 366 P.2d 502, 506 (1961). It was stated in *Cannon*, supra, 267 U.S. at 336, 45 S.Ct. at 251:

> "The obstacle insisted upon is that the court lacked jurisdiction because the defendant, a foreign corporation, was not within the state."

No questions of the constitutional powers of the state or of the federal government were directly involved. Thus, the Court in *Cannon*, at 334–335, 45 S.Ct. at 250, framed the question before it as:

> ". . . whether at the time of the service of process, defendant was doing business within the state in such a manner and to such an extent as to warrant the inference that it was present there." (Citing *Bank of America v. Whitney Central National Bank*, 261 U.S. 171, 43 S.Ct. 311, 67 L.Ed. 594 (1923).

This was the same standard of corporate "presence" established in *Philadelphia & Reading Ry. v. McKibbin*, 243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710 (1917), and cited in *Shaffer*, supra, 433 U.S. at 201, 97 S.Ct. at 2579, as one of the jurisdictional fictions displaced by *International Shoe*.

Because the Cudahy parent had not entered the forum, but rather had elected to have a separate subsidiary do business there, the only way for plaintiff to attempt to obtain service was to establish on traditional corporate law principles those facts that would permit a court to pierce the corporate veil, find the subsidiary to be the mere "alter ego" of its parent, and treat the two corporations as a single entity. Numerous courts have concluded that this would have rendered the non-resident "doing business within the state in such a manner and to such an extent as to warrant the inference that it was present there." The business done, however, would be that of its subsidiary, and the "presence" would be that of the two corporations treated as one. Even this conclusion, however, finds dubious support in the *Cannon* opinion. The trial court there had already concluded that on the given facts the corporate veil between the two corporations could be pierced for liability purposes. *Cannon Mfg. Co. v. Cudahy Packing Co.*, 292 F. 169, 176 (W.D.N.C.1923).

On the facts before the *Cannon* Court, the issue was "simply whether the corporate separation carefully maintained must be ignored in determining the existence of jurisdiction." 267 U.S. at 336, 45 S.Ct. at 251. The language of *Cannon* relied on the concepts of the corporate fiction, limited corporate liability, and the privileges that flow from formal separation of corporate identities. The Court held that absent a statute authorizing extraterritorial service, or a statute authorizing service on a local corporation's non-resident parent, service of process could not be had on the parent by virtue of service on its subsidiary "present" in the forum. If service was issued under a "doing business" statute, separation of corporate identities was sufficient to separate the "business done" and render the non-resident beyond the scope of the service authorized by statute. Jurisdiction therefore could not be invoked. The Court stated, at 267 U.S. 338, 45 S.Ct. at 252:

> "We cannot say that for purposes of jurisdiction, the business of the Alabama [subsidiary] corporation in North Carolina

became the business of the defendant [parent corporation]."

The theory of corporate "presence" required no less. Interpreting only the elements of "presence," *Cannon* therefore represented one piece of that "patchwork of legal and factual fictions . . . generated from the decision in *Pennoyer v. Neff* [95 U.S. (5 Otto) 714, 24 L.Ed. 565]." *Shaffer*, 433 U.S. at 220, 97 S.Ct. at 2588 (Brennan, J., concurring and dissenting).

The jurisdictional theory that underlay *Cannon* examined whether a corporation was "doing business" sufficient to warrant an inference of "presence" in the forum. It was but one of three fictional theories historically developed to facilitate service of process on corporations and individuals in an age when jurisdiction was predicated on a state's sovereign power over persons and property within its territorial borders. State court jurisdiction was then:

". . . defined by the 'principles of public law' that regulate the relationships among independent nations. The first of those principles was 'that every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory. . . .' [I]f the defendant consented to the jurisdiction of the state courts or was personally served within the State, a judgment could affect his interest in property outside the State. But any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the limits of the State's power." *Shaffer*, supra, 433 U.S. at 195, 97 S.Ct. at 2576–77 (Marshall, J.)

The territorial power theory of jurisdiction found its most permanent embodiment in the case of *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 24 L.Ed. 565 (1877). Justice Field there cited Story's *Conflict of Laws*, and held that a state's ability to exercise jurisdiction over non-residents was limited by the territorial restrictions on the state's sovereign power:

". . . where the entire object of the action is to determine the personal rights and obligations of the defendant, that is,

where the suit is merely *in personam* . . . [p]rocess from the tribunals of one state cannot run into another state, and summon parties there domiciled to leave its territory and respond to proceedings against them." (95 U.S. 727.)

To reach this conclusion, Justice Field relied on the earlier Supreme Court decision of *Mills v. Duryee*, 11 U.S. (7 Cranch) 481, 486, 3 L.Ed. 411 (1813), which recited that:

"There are certain eternal principles of justice, which ought never to be dispensed with, and which courts of justice never can dispense with, but when compelled by positive statute. One of these is, that jurisdiction cannot be justly exercised by a state over property not within the reach of its process, or over persons . . . not subjected to their jurisdiction, by being found within their limits."

The *Pennoyer* Court read into the due process clause of the Fourteenth Amendment these same "eternal principles of justice:"

"To give such proceedings any validity, there must be a tribunal competent by its constitution—that is, by the law of its creation—to pass upon the subject matter of the suit; and, if that involves merely a determination of the personal liability of the defendant, he must be brought within its jurisdiction by service of process within the State, or his voluntary appearance." (95 U.S. at 733.)

The principles of *Pennoyer* and the corollaries derived from them became the basic elements of the constitutional doctrine which governed state court jurisdiction. See *Shaffer*, supra, 433 U.S. at 198, 97 S.Ct. at 2577. The territorial power theory, however, posed unusual problems when jurisdiction was sought over non-resident corporations that conducted business in more than one state. These arose from the early notion that a corporation was an artificial person existing only within the state of its creation, a notion which derived from the famous dictum in *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 588, 10 L.Ed. 274 (1839):

"A corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and by force of the law; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation; and cannot migrate to another sovereignty."

The quasi-sovereignty of the several states did not foreclose a corporation's engaging in business activity beyond the borders of the sole state of its incorporation, but it impliedly predicated that out-of-state activity on the permission of the government of the state in which the business activity was conducted. See Kurland, *The Supreme Court, the Due Process Clause and the In Personam Jurisdiction of State Courts*, 25 U.Chi.L.Rev. 569, 578 [hereinafter cited as "Kurland, In Personam Jurisdiction"]. Without more, however, this rule left corporations amenable to suit only in the state of their incorporation. See *Bank of Augusta v. Earle*, supra, at 587–88. Consistent with the notion that state court jurisdiction was based on the *de facto* territorial power of a state to seize a person or thing within its boundaries, extraterritorial service of process was unavailable to bring a non-resident corporation into the jurisdiction and to require it to defend itself in litigation there.

The inappropriateness of this limitation became evident when viewed in light of commercial realities and a growing reliance on the corporate form as a means of conducting economic activity. See Kurland, *In Personam Jurisdiction*, supra, at 578. Even the *Pennoyer* Court recognized that a literal application of the rigid territorial power analysis of jurisdiction there enunciated was not consistent with contemporary standards of jurisdiction in certain cases. See *Shaffer*, 433 U.S. at 201, 97 S.Ct. at 2579; *Pennoyer*, 95 U.S. at 734–36. The difficulties in reaching a corporate defendant for suit led to the development of three fictional jurisdictional theories, which ultimately prompted the Supreme Court to respond in *International Shoe*. See Note, *Developments in the Law—State Court Jurisdiction*, 73 Harv.L.Rev. 909, 917 (1960) [hereinafter "Note, State Court Jurisdiction."]

The first theory to evolve was the "consent" theory, which rested jurisdiction on the power of a state to permit or refuse a non-resident corporation the privilege of doing business within that state. As stated in *Paul v. Virginia*, 75 U.S. (8 Wall) 168, 181, 19 L.Ed. 357 (1868), quoted in Kurland, *In Personam Jurisdiction*, supra at 581:

"The corporation being the mere creation of local law, can have no legal existence beyond the limits of the sovereignty where created. . . . Having no absolute right of recognition in other states, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion."

The state could, therefore, impose as a condition precedent to its permission the statutory requirement that the non-resident corporation consent to service of process in that state by appointing an agent therein for service of process. *LaFayette Insurance Co. v. French*, 59 U.S. (18 How.) 404, 407, 15 L.Ed. 451 (1855).

The state was also found able to impose by implication the requirement that a corporation be amenable to service on an agent in the forum state for any claim arising out of the corporation's transactions in the state. This theory of "implied consent" appeared in *St. Clair v. Cox*, 106 U.S. 350, 356, 1 S.Ct. 354, 27 L.Ed. 222 (1882), but carried with it the limitation that the "consensual" acceptance of service must be related to causes of action arising out of the corporation's business dealings in the forum.

The distinction between "implied" and "expressed" consent, and the accuracy of the term "consent" itself, were criticized by various judges and authors, as in *Smolik v. Philadelphia & Reading Co.,* 222 F. 148, 151 (S.D.N.Y.1915) (L. Hand, J.):

> "When it is said that a foreign corporation will be taken to have consented to the appointment of an agent to accept service, the court does not mean that as a fact it has consented at all, because the corporation does not in fact consent; but the court, for purposes of justice treats it as if it had. . . . The court, in the interests of justice, imputes results to the voluntary act of doing business within the foreign state, quite independently of any intent."

The Supreme Court nevertheless continued to rely on the restrictive corporate fiction declared in *Bank of Augusta v. Earle,* supra, and thus continued to apply the consent theory as late as 1933. *Washington, ex rel. Bond & Goodwin & Tucker, Inc. v. Superior Court,* 289 U.S. 361, 364, 53 S.Ct. 624, 77 L.Ed. 1256 (1933). See generally, Kurland, *In Personam Jurisdiction,* at 578–80.

This theory was later supplemented by the "presence" doctrine in *Philadelphia & Reading Ry. v. McKibbin,* supra, 243 U.S. at 264–265, 37 S.Ct. 280, cited in *Shaffer,* supra, 433 U.S. at 201, 97 S.Ct. at 2579:

> "A foreign corporation is amenable to process to enforce a personal liability, in the absence of consent; only if it is doing business within the state in such manner and to such extent as to warrant the inference that it is present there."

The presence theory was suggested for the first time in 1882 in *St. Clair v. Cox,* supra, but was first used independently to sustain jurisdiction in *International Harvester Co. v. Kentucky,* 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 (1914). The theory rejected by implication the dicta in *Bank of Augusta* and, unlike the consent theories, would sustain jurisdiction against corporations on claims not arising out of the business done within the state.

Notwithstanding the inconsistencies in the different theories, they became merged, in effect, into a "doing business" test. The application of either necessitated a determination whether the foreign corporation was "doing business" within the state, either to decide whether its consent could be implied, or to decide whether the inference of "presence" could be drawn. See *Shaffer,* 433 U.S. at 201, 97 S.Ct. at 2579. See also, Kurland, *In Personam Jurisdiction,* at 582–86; Note, *State Court Jurisdiction,* at 921–923. A great body of case law developed that drew technical distinctions between various activities constituting the "doing of business." These fine lines made little sense in terms of either theory. *Hutchinson v. Chase & Gilbert,* 45 F.2d 139, 141–42 (2d Cir. 1930). See also, Gavin, *Doing Business As Applied to Foreign Corporations,* 11 Temp.L.Q. 46 (1936); Issacs, *An Analysis of Doing Business,* 25 Colum.L.Rev. 1018, 1028–29 (1925).

The application of the "presence" doctrine was soundly criticized by Judge Learned Hand, in *Hutchison v. Chase & Gilbert, Inc.,* supra, at 141:

> "It scarcely advances the argument to say that a corporation must be 'present' in the foreign state, if we define that word as demanding such dealings as will subject it to jurisdiction, for then it does no more than put the question to be answered. Indeed, it is doubtful whether it helps much in any event. It is difficult, to us it seems impossible, to impute the idea of locality to a corporation, except by virtue of those acts which realize its purpose.

> . . . . .

> "When we say, therefore, that a corporation may be sued only where it is 'present' we understand that the word is used, not literally, but as shorthand for something else.

> . . . . .

> "[Business in the state of the forum] appears to us to be really the controlling consideration, expressed shortly by the word 'presence,' but involving an estimate of the inconveniences which would

result from requiring it to defend, where it has been sued. We are to inquire whether the extent and continuity of what it has done in the state in question makes it reasonable to bring it before one of its courts. Nor is it anomalous to make the question of jurisdiction depend upon a practical test . . . at least it puts the real question, and that is something."

As noted by Judge Hand, the test of "presence" had offered a mere legal conclusion. Jurisdiction existed when a corporation did sufficient business to warrant the inference of "presence." It did not, however, offer a test which would aid in reaching that conclusion. The "doing business" test added little. Judge Hand's characterization of the test as "shorthand for something else" foreshadowed the eventual acknowledgment and acceptance of the test as one of fairness and relative interest balancing, which the Supreme Court established in *International Shoe.*

## THE IMPACT OF *INTERNATIONAL SHOE* AND *SHAFFER* ON THE *CANNON* RULE

The Court in *International Shoe* rejected the jurisdictional requirement that a non-resident defendant be "present" within the forum before service of process on the non-resident and jurisdiction would be proper. The Court, however, did not purport to overrule those old cases which founded jurisdiction on "presence" or "consent." Rather, Chief Justice Stone acknowledged, as had Judge Hand in *Hutchinson v. Chase & Gilbert, Inc.,* supra, that the two doctrines were fictional theories which employed conclusory language to indicate when the assumption of jurisdiction was reasonable. The Court then set out the now famous factors that weigh in the balance of interests and control the determination whether the exercise of jurisdiction over a non-resident meets constitutional requirements. This analysis is by now well known. As stated in *International Shoe,* supra, 362 U.S. at 316, 317, 66 S.Ct. at 158, 159:

"Due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

. . . . .

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. . . . Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.

. . . . .

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

The due process "fundamental fairness" test of *International Shoe* substantially altered the focus of those considerations which were deemed relevant to the constitutional exercise of personal jurisdiction over non-residents. The tests that had emerged from the earlier fictional doctrines had in essence been quantitative. See *Shaffer,* 433 U.S. at 201, 97 S.Ct. at 2579; also Note, *State Court Jurisdiction,* at 923. *International Shoe* rendered the test a qualitative analysis of several circumstances of each particular case. The relationship

among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the states on which the rules of *Pennoyer* rest, became the central concern of the inquiry into personal jurisdiction. *Shafter,* 433 U.S. at 203, 97 S.Ct. at 2580, quoted *International Shoe,* 326 U.S. at 317, 66 S.Ct. at 154, as follows:

> "The inquiry into the State's jurisdiction over a foreign corporation appropriately focused not on whether the corporation was 'present' but on whether there have been 'such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there.' "

The existence of jurisdiction under *International Shoe* thus depends on a "sufficient connection between the defendant and the forum State as to make it fair to require defense of the action in the forum." See *Kulko v. Superior Court,* 436 U.S. 84, at 91, 98 S.Ct. 1690, at 1697, 56 L.Ed.2d 132 (1978). The requirement of overall fairness is as significant as the necessity that a defendant have at least a minimal tie or relationship to the forum. See 2 Moore, *Federal Practice,* ¶ 4.25[5] at 1171–73 (2d ed. 1977). Relevant due process considerations include the inconvenience of litigation in the forum, concerns relating to the fair and orderly administration of the laws, the "quality and nature" of the defendant's contacts with the forum, and whether these contacts bear any relation to plaintiffs' claims. *International Shoe,* 326 U.S. at 317, 66 S.Ct. 154; also Casad, *Long Arm and Convenient Forum,* 20 Kan.L.Rev. 1, 4–7 (1971) (hereinafter "Casad, *Long Arm* "). It remains the duty of the court to weigh the facts of each case to determine whether the requisite "affiliating circumstances" are present, so that it is both reasonable and fair to require the defendant to answer in the forum. *Kulko v. Superior Court,* supra, 436 U.S. at 91, 98 S.Ct. at 1697.

A court, however, cannot acquire jurisdiction over a party solely by being the "center of gravity" of the controversy. It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the state. *Hanson v. Denckla,* 357 U.S. 235, 253–54, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Yet there is no requirement that these activities be conducted personally by the non-resident defendant physically in the forum. See *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1951). Due process may be satisfied and jurisdiction may be constitutionally exercised over a non-resident who has no physical contacts with a forum. *Travelers Health Ass'n. v. Virginia,* 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). Similarly, jurisdiction may be predicated on a non-resident's activities in the forum even when they bear no relation to plaintiffs' claim. *Perkins v. Benquet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); *Shaffer,* supra, 433 U.S. at 208–09, 97 S.Ct. at 2582–83.

The decision in *International Shoe* withdrew the constitutional implications from the *Cannon* decision and the "alter ego" doctrine as applied in jurisdictional analysis. Because extraterritorial service of process was statutorily unavailable on the facts before the *Cannon* Court, the decision there spoke only to the insufficiency of the manner of service—domestic service on a corporation "present" within the forum through the business activities of a separately maintained subsidiary in the forum. *Cannon* impliedly relied on corporate law principles to determine whether a parent corporation was "doing business" in the forum and therefore subject to domestic service of process under the appropriate statute. *Cannon* merely imposed this statutory obstacle. The constitutional due process constraint of "presence" that *Cannon* reflected was disapproved in *International Shoe.* Physical presence in the forum was no longer a necessary element to support jurisdiction. Reliance on *Cannon* and the alter ego doctrine for constitutional purposes thus became unnecessary whenever extraterritorial

service on the particular defendant was authorized by statute and when, under *International Shoe,* the propriety of jurisdiction was solely dependent upon the qualitative fairness of requiring the defendant to answer in the forum.

*Cannon,* however, did retain some marginal vitality in two situations—one statutory and one constitutional. The *Cannon* rule and alter ego principles generally still applied in cases that raised the statutory issue of the sufficiency of the method of service under state or federal law—namely, whether a particular statute authorized service on a given defendant. Thus, if a statute authorized service on "anyone who does business in the forum," satisfaction of the alter ego test was necessary to permit service, under the statute and Rule 4(e), Fed.R. Civ.P., on a non-resident who did business in the forum through an alter ego corporation. Alter ego principles might thus be an appropriate device to extend extraterritorial service to persons not specifically within the literal ambit of the statute or rule that authorized service.

Similarly, if a non-resident corporation was not personally served, but rather received service solely on its subsidiary in the forum, as in *Cannon,* then alter ego analysis was necessary to resolve the issue of the sufficiency of the manner of service. Alter ego principles essentially would permit treatment of two corporations as one. Domestic service on a subsidiary corporation in the forum would be sufficient, under Rule 4(d)(3) or (d)(7), Federal Rules of Civil Procedure, for service on the non-resident corporation. In neither statutory situation, however, would the *Cannon* doctrine or alter ego principles bear on the constitutional power of the state to authorize that service.

*Cannon* retained some modest constitutional vitality after *International Shoe* in only one limited context, but one that saw substantial usage in cases decided prior to *Shaffer.* The Court in *International Shoe* only rejected the necessity of a quantitative "presence" within the forum as a constitutional basis for jurisdiction. The Court did not expressly reject the territorial power

theory as the foundation for state court jurisdiction. Thus, if a defendant "be not present within the territory of the forum," his amenability to suit in that forum became dependent upon the analysis of the due process considerations noted above. *International Shoe* therefore left open the alternative that domestic service on a non-resident physically present in the forum might alone be a sufficient basis for the constitutional exercise of jurisdiction over the non-resident, notwithstanding the balancing of interests enunciated in that opinion.

Thus, the constitutional exercise of jurisdiction over a non-resident could still be predicated on the presence of an alter ego in the forum as a sufficient, though no longer necessary basis for jurisdiction. Jurisdiction over the non-resident could justifiably be predicated on the court's jurisdiction over the domestic alter ego and the court's ability to impute to the non-resident the alter ego's physical presence in the forum. Jurisdiction could be invoked under this rationale by domestic service either on the alter ego or on its designated agent. Because of its imputed "presence" in the forum, the non-resident could be made to answer on any cause of action, whether or not related to the domestic alter ego corporation's activity in the forum. See *International Harvester Co. v. Kentucky,* supra.

At least one court acknowledged the disparity in standard between a non-resident corporation "present" in the forum for purposes of domestic service of process and a corporation with a sufficient "nexus" with the forum to render constitutional the court's exercise of jurisdiction over the non-resident once properly served. *Szantay v. Beech Aircraft Corp.,* 237 F.Supp. 393, 403–04 (E.D.S.C.1965). After *International Shoe,* reliance on alter ego principles may have been statutorily necessary to authorize domestic service on a non-resident present in the forum, but reliance on alter ego principles to establish presence as a constitutional basis for jurisdiction over a non-resident was judicial overkill. See *Wells Fargo & Co. v. Wells Fargo Express Co.,*

504

556 F.2d 406, 420 n. 13 (9th Cir. 1977) (noting alter ego principles employed as an alternative ground to support jurisdiction under a quantitative "presence" analysis, in contrast with the minimum contacts approach employed when extraterritorial service was had on the non-resident itself). The availability of this alternative basis for jurisdiction persisted, however, until the Supreme Court decision in *Shaffer.*

With the decision in *Shaffer,* the Supreme Court thoroughly undermined the remaining constitutional value of *Cannon. Shaffer* emphatically announced that "all assertions of state court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." *Shaffer,* supra, 433 U.S. at 212–13, 97 S.Ct. at 2584–85. ·The Court in that case indicated 433 U.S. at 213, 97 S.Ct. at 2585, n. 39:

> "It would not be fruitful for us to reexamine the facts of cases decided on the rationales of *Pennoyer* and *Harris* [*v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023] to determine whether jurisdiction might have been sustained under the standard we adopt today. *To the extent that prior decisions are inconsistent with this standard, they are overruled.*" (Emphasis added.)

The noted prior decisions are those which the Court discussed in its historical development of the "consent" and "presence" theories of jurisdiction, the "patchwork of legal and factual fictions that has been generated from the decision in *Pennoyer v. Neff.*" *Shaffer,* supra, 433 U.S. 186, 97 S.Ct. at 2588 (Brennan, J.) Whether established by "doing business," "express or implied consent," or by physical fact, presence is therefore neither necessary nor always sufficient as a basis to support the exercise of jurisdiction. See *Schreiber v. Allis-Chalmers Corp.,* 448 F.Supp. 1079, 1089 (D.Kan.1978); also, *Casad, Shaffer v. Heitner, An End to Ambivalence in Jurisdiction Theory?,* 26 Kan.L.Rev. 61, 77 (1977).

After *Shaffer,* therefore, satisfaction of the constitutional criteria is not automatic when service is authorized by a "doing business" or "consent" statute. Even if a non-resident is found to be "doing business" in the forum, or has impliedly consented to service of process, the Court must still examine whether the exercise of the jurisdiction invoked by that state statute violates the fairness or minimum contacts test of *International Shoe. Schreiber v. Allis-Chalmers Corp.,* supra, at 1089–1090. A finding that a corporation is "present" or "doing business" does not necessarily present facts that would prove sufficient under all circumstances to satisfy that test. See Comment, *The Expanded Scope of the Sufficient Minimum Contacts Standard: Shaffer v. Heitner,* 63 Iowa L.Rev. 504 (1977). Satisfaction of the alter ego test still begs the constitutional question whether the exercise of the jurisdiction so invoked over the non-resident, whether or not "present" in the forum, meets the standards of *International Shoe.* Consequently, jurisdiction over a non-resident cannot automatically be predicated on the "presence" in the forum of a domestic affiliated corporation, regardless whether it exists as the alter ego of the non-resident.

The impropriety of reliance on *Cannon* and alter ego theories as constitutional obstacles to the exercise of jurisdiction should be clear. *Cannon's* mechanical or quantitative test for "doing business" and corporate "presence" is implicitly disapproved by *International Shoe.* See *Shaffer,* supra, 933 U.S. at 203, 97 S.Ct. at 2580. The constitutional breadth of the minimum contacts test of *International Shoe* is not dependent upon a corporation's "doing business" in the forum. To read *Cannon* or the alter ego doctrine as a limitation upon *International Shoe* is to elevate to a constitutional level a statutory obstacle to extraterritorial service of process that was generated in the context of a now obsolete jurisdictional analysis.

*Cannon* did not even purport to address the constitutionality of the exercise of jurisdiction over an absent corporation that transacts business in the forum through an affiliated corporation. The *Cannon* doctrine instructed what might not be con-

sidered "doing business" for purposes of domestic service on a quantitatively "present" defendant. *Cannon* so held in the absence of a statute providing a means for extraterritorial service on a defendant not present in the forum. This Court has today held that the Kansas statute, broadly construed, authorizes service on a defendant who transacts business in the forum through the instrumentality of any other entity, including an affiliated corporation. Because service is statutorily proper on the facts before this Court, the constitutional question that *Cannon* could not address is thus squarely raised. The *International Shoe* standard, and not the "doing business" test underlying *Cannon,* must provide the answer.

■ Contemporary reliance on *Cannon* necessarily generates both constitutional and statutory incongruities. Once service is specifically authorized, the constitutionality of the exercise of jurisdiction so invoked is controlled solely by the constraints of the due process clause. Constitutional reliance on *Cannon* or alter ego theory as a jurisdictional prerequisite resurrects in the Fourteenth Amendment the now discarded principles of "presence," a "fictional outgrowth of [*Pennoyer*] such as the existence of a consent statute, express or implied." *Shaffer,* supra, 433 U.S. at 227, 97 S.Ct. at 2592 (Brennan, J., concurring and dissenting in part). Any continued constitutional vitality of *Cannon* would further the jurisdictional analysis that the *Shaffer* Court meant finally to lay to rest.

This anomaly is demonstrated by its effect on the use of modern long-arm statutes. When a statute permits service on one who through another entity "transacts business" in the forum, constitutional reliance on *Cannon* would foreclose the exercise of jurisdiction in the long-arm context over anyone not "doing business," and therefore not present in the forum under the older jurisdictional analysis. It would effectively equate the *International Shoe* standard with the older and narrower jurisdictional standards that *International Shoe* displaced. This equation was expressly re-

jected by the Kansas Supreme Court, as well as by many others, which acknowledged that the long-arm statute meant to extend service beyond that permitted under prior statutes and to expand jurisdiction to the fullest extent permissible under the Fourteenth Amendment. See, *Woodring v. Hall,* 200 Kan. 597, 606, 438 P.2d 135, 144 (1968); *Lurie v. Rupe,* 51 Ill.App.2d 164, 201 N.E.2d 158 (1964) (holding on comparable Illinois long-arm statute); *cf., United States v. Montreal Trust Co.,* 358 F.2d 239, 246 (2d Cir. 1966) (New York law); *Willis v. Semmes,* 441 F.Supp. 1235, 1241 (E.D.Va. 1977). This equation would also confuse the jurisdictional alternatives available to plaintiffs under the rationale of *International Shoe.* Extraterritorial service on a non-resident corporation pursuant to Rule 4(e), Fed.R.Civ.P., in conjunction with a state long-arm statute, could not constitutionally extend further than that already available under provisions for domestic service pursuant to Rule 4(d)(3) or (d)(7), Fed. R.Civ.P., on a non-resident corporation "present" in the forum through its affiliated corporation or agent.

Indeed, transformation of alter ego principles into a restriction on the breadth of constitutional due process raises inherent inconsistencies in the fundamental fairness or minimum contacts analysis of the Fourteenth Amendment as defined by *International Shoe.* See, e. g., Ehrenzweig, *Conflict of Laws,* 110–118 (1962); Note, *State Court Jurisdiction,* supra, at 932–33. These inconsistencies derive from the vastly divergent standards applicable to each test—the fairness of requiring a defendant to answer in a particular case on one hand, and on the other, the old standards once applicable to pierce a corporate veil, find a corporation "present" within the forum to defend on *any* cause of action there raised, and to hold it accountable for the liabilities of an affiliated corporation.

The Supreme Court has held that the test of *International Shoe* requires a lesser relationship with the forum to sustain jurisdiction on a claim that arises from that very relationship, than it does on a claim not

arising therefrom. See *Perkins v. Benquet Consolidated Mining Co.*, supra; see generally, Van Mehren and Troutman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv.L.Rev. 1121 (1966). By requiring as a constitutional prerequisite an alter ego relationship between a non-resident and resident, a court would ignore this difference in standard. Jurisdiction could not be asserted over a non-resident without a showing adequate to establish a corporate "presence" sufficient to render a corporation amenable to suit on any claim in the forum, whether or not related to the non-resident's ties with the forum, regardless of the inconveniences of litigation there, and without regard to judicial concerns for the fair and orderly administration of the laws. Predicating jurisdiction on alter ego principles would thus foreclose a balancing of those several interests mandated by the Supreme Court in *International Shoe* to determine the jurisdictional issue.

Furthermore, use of alter ego principles as a constitutional prerequisite to the exercise of jurisdiction over a non-resident raises in the formal separation of corporate identities a constitutional immunity to suit in a specific forum that corporate law principles do not purport to create. *Cannon* did not purport to proclaim any such immunity. The implication is found in *Cannon* and subsequent decisions of lower courts that an alter ego relationship is either necessary or sufficient to sustain jurisdiction over a non-resident. This implication, however, derives solely from the jurisdictional framework underlying *Cannon* that precluded the assertion of jurisdiction over a non-resident not "present" in the forum. This half of the constitutional viability of *Cannon*—jurisdictional necessity of a·quantitative "presence"—was lost with *International Shoe*. The final half—the jurisdictional sufficiency of a quantitative "presence"—saw its demise with *Shaffer*.

 Moreover, reliance on alter ego principles as a constitutional prerequisite to jurisdiction makes little sense in terms of logic or the fundamental fairness analysis of *International Shoe*. The alter ego and minimum contacts tests bear little relation to each other. Alter ego principles represent a body of law designed to indicate under what circumstances liability may be "fastened on an individual who uses the corporation merely as an instrumentality to conduct his own personal business." *Quarles v. Fuqua,* 504 F.2d 1358, 1362 (10th Cir. 1974). The standards for this imposition of liability notwithstanding the corporate shield are high. The liability must arise from fraud or injustice perpetrated on third parties in their dealings with the corporation. *Kilpatrick Bros., Inc. v. Poynter,* 205 Kan. 787, 473 P.2d 33 (1970). Injustice to those third parties must follow from the judicial recognition of the separate corporate identities. *Quarles v. Fuqua*, supra, citing *Garden City Co. v. Burden*, 186 F.2d 651 (10th Cir. 1951). The corporate entity must have been used "as a cloak or cover for fraud or illegality, or to work an injustice." *Kilpatrick Bros., Inc. v. Poynter*, supra; *International Union v. Cardwell Mfg. Co.*, 416 F.Supp. 1267 (D.Kan.1976).

 Thus, the power to pierce the corporate veil must be "exercised reluctantly and cautiously," and "single ownership alone [does] not support the alter ego theory and justify a disregard of the corporate entity." *Amoco Chemicals Corp. v. Bach*, 222 Kan. 589, 593–94, 567 P.2d 1337, 1341 (1977). The Kansas Court in *Amoco* lists some of the factors considered significant in justifying a disregard of the separation of corporate identities. These include undercapitalization, misuse or intermingling of corporate funds, absence of separate corporate records, and the use of a corporation as a facade for the operations of the dominant stockholder. 222 Kan. at 594, 567 P.2d 1337. These factors are all significant in gleaning from the record whether the formal corporate separation has been maintained. They are equally well known to students of corporate law. These factors all indicate those circumstances under which a subsidiary corporation and its parent or owner may be treated as one for purposes of liability. These factors, however, have little relation to those which bear

upon the due process fairness question of requiring a defendant to answer in the forum.

Corporate law factors reflect only one aspect of the "quality and nature" of one of the non-resident's ties with the forum, namely, its business relationship with an affiliated corporation in the forum. The inconvenience of litigation in the forum, concerns for the fair and orderly administration of the laws, and whether the claim asserted arises in the forum, are relevant jurisdictional factors not reflected in alter ego analysis. Other characteristics of the non-resident which may reflect the "quality and nature" of its various ties with the forum are similarly excluded, including, for example, the amount of revenue it derives from affiliated corporations in the forum and how much direction it gives or receives from an affiliated corporation in the forum. Propriety of piercing the corporate veil rests upon an analysis of corporate law factors. The constitutional propriety of the exercise of jurisdiction rests upon a balancing of the different considerations noted above. The results obviously are not necessarily consistent.

Concededly, a corporation's relationship with an affiliated corporation in the forum is relevant to the due process question in a manner different from that in which it pertains to the corporate law question of alter ego relationships and "veil piercing." For alter ego purposes the nature of the relationship—the identity between the corporations—is alone controlling. For jurisdictional purposes, the fact of the existence of the relationship—however substantial or attenuated the relationship may be—is a minimum "contact, tie or relation" with the forum that may render possible the constitutional exercise of jurisdiction if the relevant factors, including both convenience and the orderly administration of the laws, balance in that direction. The mere existence of the relationship is one relevant factor. The nature of the relationship—the degree of control or identity—bears upon the weight to be given that one factor, but it does not foreclose reliance on this factor as a legitimate consideration in the due process analysis. The distinction between the two standards should be readily apparent.

■ A non-resident corporation's tie to the forum, as established through its relationship with an affiliated corporation physically present or transacting business there, is one factor upon which a court may rely to determine whether jurisdiction over the non-resident may be constitutionally exercised. Quite clearly, the ownership of an affiliated corporation within the forum is a "contact, tie or relation" of that non-resident with the forum. Similarly, the presence in the forum of an affiliated corporation that directs or provides funds or benefits to a non-resident is a "contact, tie or relation" of that non-resident with the forum. Either represents a "commercial act" or relationship that "connotes [an] intent to obtain [or an] expectancy of receiving a corresponding benefit in the State that would make fair the assertion of that State's judicial jurisdiction." *Kulko*, supra, 436 U.S. at 101, 98 S.Ct. at 1702. Like the ownership of property in the state, the existence in a forum of an affiliated corporation with which the non-resident has some relationship implicates a flow of control and benefits to and from the forum as a consequence of that ownership. It is thus one indication of the non-resident's nexus with the forum and therefore has some weight in the overall evaluation of the fairness or reasonableness of the exercise of jurisdiction. See *Shaffer*, supra, 433 U.S. at 208–09, 97 S.Ct. at 2582–83; *Intermeat, Inc. v. American Poultry Inc.*, 575 F.2d 1017 (2d Cir. 1978); *Hutchinson v. Chase & Gilbert, Inc.*, supra, at 142 (dictum indicating that ownership alone might not render reasonable the assertion of jurisdiction); *Empire Steel Corp. v. Superior Court*, 56 Cal.2d 823, 829–30, 17 Cal.Rptr. 150, 153–54, 366 P.2d 502, 505–06 (1961) (dictum indicating that ownership alone might be sufficient); see also Comment, *Jurisdiction Over Parent Corporations*, 51 Cal.L.Rev. 574, 575 (1963); Note, *State Court Jurisdiction*, supra, at 933.

Put simply, separation of formal corporate identities does not impose a constitutional barrier to the exercise of jurisdiction over a non-resident corporation. The activity or presence in the forum of a corporation that either owns or is owned by a non-resident corporation is in many, if not all cases, an affiliating circumstance of the non-resident with the forum. If a statute or rule provides a means to serve a non-resident by virtue of that ownership or control, the constitutional issue of the propriety of jurisdiction must be resolved on *International Shoe* standards of fair play and substantial justice. The nature of the intercorporate relationship, or the relationship between a corporation and its owner, is highly probative of the "quality and nature" of the non-resident's contact with the forum through an affiliated corporation. In those cases where the non-resident may have controlled or directed the acts that give rise to plaintiff's claim, the intercorporate relationship is further illustrative of the relationship of the non-resident to the litigation. It would seem apparent, too, that the intercorporate relationship generally may help establish the relative inconvenience imposed on the non-resident to litigate in the particular forum.

The Court is compelled to conclude that the intercorporate relationship of affiliated corporations, both generally and with regard to the specific acts that give rise to plaintiffs' claim, is probative of the fairness of requiring a non-resident defendant to litigate in a given forum. The Court may consider the fact of the relationship and weigh its relative significance, whether or not it is sufficient under principles of corporate law to support a finding of "alter ego" or "instrumentality" sufficient to pierce the corporate veil and impose liability on an affiliated corporation. Following the decision in *Shaffer*, corporate law analysis offers nothing that concludes or forecloses the constitutional analysis of the factors of forum ties, convenience and judicial administration that control the reasonableness of requiring a litigant to answer in the forum. In this manner, the exercise of all state court jurisdiction, and the exercise of

jurisdiction in federal court pursuant to federal rule and state statute, are properly subject to the standards of *International Shoe* and consistent with the recent decision in *Shaffer*.

## RECENT RELIANCE ON *CANNON*

Because of Superior Overseas' lengthy and strenuous argument that *Cannon* still controls the case before the Court, some comment on the defendant's authorities is warranted. It is unnecessary for this Court to review the voluminous case law that relies on an alter ego test for jurisdictional purposes. It suffices to note that many courts have acknowledged as the adage of *Cannon* that mere ownership of all the stock of a subsidiary does not, in and of itself, subject the parent corporation to the jurisdiction of the state where the subsidiary is doing business. The correlative maxim is often recited that "when a parent so controls the subsidiary as to disregard the latter's independent corporate identity, jurisdiction over the subsidiary produces jurisdiction over the parent. See *Restatement (Second) of Conflict of Laws*, § 52 comment b, at 180 (1969); see also, Note, *Personal Jurisdiction*, 25 Kan.L.Rev. 109, 119 (1976); Note, *State Court Jurisdiction*, supra, at 933. The Court feels that this general body of case law can best be examined as representing three different analytical aspects of the *Cannon* decision.

Many, if not most, alter ego cases can be explained as a statutory use of the alter ego doctrine. Thus, when a non-resident receives domestic service on its subsidiary in the forum, pursuant to Rule 4(d)(3) or (d)(7) and a state "doing business" statute that authorizes service on a designated agent in the state, a statutory question arises whether the non-resident is properly one "doing business" within the meaning of the state statute and therefore subject to domestic service on its designated agent. A finding of an alter ego ʳelationship between the non-resident and the domestic affiliate may be deemed necessary to render the business of the domestic affiliate the business of the

non-resident. If the non-resident is "doing business" in the forum in the guise of its subsidiary, the statute may authorize service on the non-resident through service on the affiliate or a designated agent in the forum. See *Farkas v. Texas Instruments, Inc.*, 50 F.R.D. 484 (D.Mass.1969), aff'd. 429 F.2d 849 (1st Cir. 1970) (service on Secretary of Commonwealth where subsidiary did business); *Cf., Goldrick v. D. M. Picton Co.*, 56 F.R.D. 639 (E.D.Va.1971) (service on State Corporation Commission). A finding of sufficient separation of corporate identities results in a finding of lack of personal jurisdiction.

A similar statutory use of alter ego or agency principles relies on the old case of *International Harvester Co. v. Kentucky*, supra, which held that the activities of an agent in the forum constituted the "doing of business" by the principal corporation within the forum under the old "presence" theory of jurisdiction. Thus, when a corporation receives domestic service on an officer or an affiliated corporation in the forum, pursuant to Rule 4(d)(3) or (d)(7) and a state "doing business" statute, the propriety of the method of service turns on whether the domestic corporation or officer served is an agent of the non-resident over whom jurisdiction is sought. See, e. g., *Boryk v. deHavilland Aircraft Co.*, 341 F.2d 666 (2d Cir. 1965) (service on domestic subsidiary as agent of defendant British parent corporation); *Szantay v. Beech Aircraft Corp.*, 237 F.Supp. 393 (E.D.S.C.1965), aff'd. 349 F.2d 60 (4th Cir. 1965); *Mas v. Orange-Crush Co.*, 99 F.2d 675 (4th Cir. 1938).

In either event, satisfaction of an agency or alter ego test would render the non-resident statutorily subject to service under statutes that contemplate service of process on those "present" or "doing business" in the forum. See, e. g., *Harris v. Deere and Co.*, 223 F.2d 161 (4th Cir. 1955); *Dunn v. Beech Aircraft Corp.*, 276 F.Supp. 91 (E.D. Pa.1967); *Williams v. Campbell Soup Co.*, 80 F.Supp. 865 (W.D.Mo.1948). *Cf., Scalise v. Beech Aircraft Corp.*, 276 F.Supp. 58, 65 (E.D.Pa.1967) (examined control sufficient for alter ego relationship); *United States v. Buffalo Weaving and Belting Co.*, 155 F.Supp. 454 (S.D.N.Y.1956) (noting distinction between agent present in forum "doing business" and thereby subjecting non-resident to service, and separately maintained subsidiary in forum not subjecting non-resident parent to service under "doing business" statute); *Farha v. Signal Companies, Inc.*, 216 Kan. 471, 532 P.2d 1330, modified, 217 Kan. 43, 535 P.2d 463 (1975).

█ Similarly, in cases where jurisdiction is invoked pursuant to Rule 4(e) and a state long-arm statute, alter ego analysis may be employed to determine whether the non-resident is properly subject to service of process under that statute and rule. Thus, when a statute authorizes extraterritorial service on one who in person or through an agent commits certain acts, agency or alter ego analysis must be employed to determine whether service is authorized on a non-resident whose affiliate has committed that act allegedly as the agent or alter ego of the non-resident. See, e. g., *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492 (5th Cir. 1974); *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1974); *Murdock v. Volvo of America Corp.*, 403 F.Supp. 55 (N.D.Tex.1975); *McPheron v. Penn Central Transportation Co.*, 390 F.Supp. 943 (D.Conn.1975); *Marsh v. Kitchen*, 480 F.2d 1270 (2d Cir. 1973); *United States v. Montreal Trust Co.*, 358 F.2d 239 (2d Cir. 1966). *Cf., Karlin v. Avis*, 326 F.Supp. 1325, 1328, 1331 (E.D.N.Y.1971) (long-arm service proper by virtue of non-resident's activities through agent; alter ego principles noted in dicta as alternative for domestic service of process on alter ego "doing business" in state).

The necessity for this statutory analysis is quite clear. If a long-arm statute authorizes service only on one who in person commits certain acts, alter ego analysis must be employed to satisfy the statutory requirement if service is sought on one whose affiliated corporation has committed that act. Failure to find the alter ego relationship results in an inability to bring the non-resident within the statutory ambit of those who have "in person" committed

510

those acts. It results in a failure to satisfy the sufficiency of the method of service. As stated repeatedly, on this statutory basis *Cannon* properly supports the proposition that jurisdiction over a domestic subsidiary does not produce jurisdiction over the non-resident parent, absent an agency or alter ego relationship.

A legislature could entirely obviate this statutory analysis by authorizing the issuance of service on any entity that owns, or is owned by a corporation that may be served in the state. Service could then reach any non-resident simply by virtue of its tie to the forum state through its corporate ownership. The sole constraint then imposed on the exercise of jurisdiction would clearly be the constitutional standards of the Fourteenth Amendment as enunciated in *International Shoe* and its progeny. Because in many states the legislatures have not chosen to provide a method of service that extends so far, see, e. g., *Marsh v. Kitchen*, supra, alter ego analysis remains in some jurisdictions a relevant statutory consideration. For reasons adduced below, however, the Kansas statute itself is not so restrictive. This Court's holding obviates the need for traditional alter ego analysis in jurisdictional questions under Kansas law.

A second general usage of the alter ego concept relied on alter ego or agency theories to establish the constitutional propriety of the jurisdiction properly invoked by service authorized by statute or rule. These cases were all decided prior to *Shaffer* and relied on the sole constitutional vitality of *Cannon* that survived *International Shoe* —namely, those cases where the "presence" rationale was employed as a sufficient, though not necessary basis to support the constitutional exercise of jurisdiction over a non-resident. Thus, in cases where an agency relationship was found between a non-resident and an affiliate in the forum, the "presence" of the agent was sufficient to constitute the non-resident's "doing business" in the forum sufficient to support jurisdiction. See, e. g., *International Harvester Co. v. Kentucky*, supra; *Echeverry v. Kellogg Switchboard & Supply Co.*, 175 F.2d 900 (2d Cir. 1949) (constitutional analysis under *Cannon*); *Curtis Publishing Co. v. Cassel*, 302 F.2d 132 (10th Cir. 1962) (reliance on *Cannon* to find "presence" through agent, but recognition that alternative under *International Shoe* satisfied if minimum contacts of agent are sufficient); *Scalise v. Beech Aircraft Corp.*, supra; *Dunn v. Beech Aircraft Corp.*, supra ("presence" of non-resident through agent distributors); *Top Form Mills Inc. v. Sociedad Nationale Industria Applicazioni Viscosa*, 428 F.Supp. 1237 (S.D.N.Y.1977) (constitutional jurisdiction upheld on "presence" by virtue of agent's activities).

An analogous finding of the presence of an agent in the forum has also justified the constitutional exercise of jurisdiction when the extent of the agent's activities has been deemed sufficient to satisfy *International Shoe* standards. See, e. g., *Orefice v. Laurelview Convalescent Center, Inc.*, 66 F.R.D. 136 (E.D.Pa.1975); *Szantay v. Beech Aircraft Corp.*, supra ("presence" satisfied through agent distributors sufficiently controlled by non-resident; acknowledgment of more liberal constitutional standard under *International Shoe*). The same "presence" analysis has also been acknowledged as a constitutional basis for exercise of jurisdiction over non-resident corporations who have so controlled their domestic corporations that the latter may be treated as the alter ego of the former. See, e. g., *Lakota Girl Scout Council, Inc. v. Havey Fund Raising Management, Inc.*, 519 F.2d 634 (8th Cir. 1975); *Scalise v. Beech Aircraft Corp.*, supra. Indeed, most cases that uphold jurisdiction and distinguish themselves from *Cannon* either expressly or implicitly employ approaches that enable the court to satisfy a "doing business" or "presence" standard for the constitutional exercise of jurisdiction. See cases cited in Note, *Personal Jurisdiction*, 25 Kan.L.Rev. 109, 120 (1976); Note, *Jurisdiction—Foreign Corporations*, 39 Brooklyn L.Rev. 229 (1972); Comment, *Jurisdiction Over Parent Corporations*, supra.

This constitutional use of alter ego principles represents a jurisdictional search for a

"presence" of either the non-resident itself, its agent or its alter ego in the forum. It represents a reliance on the remaining constitutional vitality of *Cannon* that existed prior to *Shaffer*. A physical presence within the forum, without more, was still a constitutionally sufficient basis for the exercise of jurisdiction. A finding of an agent or alter ego present in the forum and subject to service foreclosed further discussion of the jurisdictional issue. With *Shaffer* and the consequent demise of the territorial power theory of jurisdiction, however, this avenue is no longer conclusive of the constitutional jurisdictional issue. The presence in the forum of an agent, alter ego, or a controlled or merely affiliated corporation is but one contact that may render a non-resident subject to a specific manner of service prescribed by statute or rule. It is similarly but one contact that should weigh in the balance of the several factors that govern the constitutional exercise of the jurisdiction sought to be invoked through the prescribed means. *Cf. Shaffer, supra*, 433 U.S. at 208, 97 S.Ct. at 2582 (noting as relevant contact the non-resident ownership of property in forum that provides benefits to non-resident).

This Court also acknowledges a third general category of cases that employ alter ego principles in jurisdictional analysis. These seem to indicate that agency or alter ego theories are the exclusive basis for the constitutional exercise of jurisdiction over a non-resident with an affiliated corporation in the forum. These cases apparently read *Cannon* as creating a constitutional barrier to the exercise of jurisdiction over a non-resident because of that non-resident's lack of personal "presence" in the forum, as could be established through either an agency or alter ego relationship with a domestic corporation. See, *e. g., Harris v. Deere and Co.*, 223 F.2d 161, 163 (4th Cir. 1955). Superior Overseas has urged this position on this Court today.

This Court respectfully disagrees with these cases that create this implication. The *Cannon* Court clearly dealt with a statutory deficiency, albeit one created under constitutional requirements generated from a jurisdictional analysis that no longer holds currency in contemporary jurisprudence. The Court there stated (267 U.S. at 336–37, 45 S.Ct. at 251) that:

> "The defendant wanted to have business transactions with persons resident in North Carolina, but for reasons satisfactory to itself did not choose to enter the state in its corporate capacity. . . . Congress has not provided that a corporation of one state shall be amenable to suit in the federal court for another state in which the plaintiff resides, whenever it employs a subsidiary corporation as the instrumentality for doing business therein. . . . *In the case at bar, the identity of interest may have been more complete and the exercise of control over the subsidiary more intimate than in the three cases cited, but that fact has, in the absence of an applicable statute, no legal significance.*" (Emphasis added.)

The applicable statute referred to was, of course, a statute that would have authorized service on a non-resident corporation whose affiliated corporation did business in the forum. The California Supreme Court clearly acknowledged the statutory character of *Cannon* in *Empire Steel Corp. v. Superior Court, supra*. Other courts have implicitly acknowledged the same. They have relied on alter ego principles to resolve the statutory issue of the manner of service, while they refer generally to *International Shoe* standards to satisfy the separate constitutional inquiry. See, *e. g., Product Promotions, Inc. v. Cousteau, supra.* This Court likewise cannot agree that *Cannon* any longer represents an obstacle of constitutional dimensions to extraterritorial service of process and the power of this Court to compel non-residents to appear before it when the fairness requirement of *International Shoe* has been satisfied. To hold so today would seriously represent a continuation of an obsolete jurisdictional analysis that the Supreme Court recently laid to rest in *Shaffer*. This Court must conclude that whenever service is authorized on a given defendant by state statute or rule, *Shaffer* dictates that the only relevant

inquiry is whether the exercise of that jurisdiction offends traditional notions of fair play and substantial justice.

## APPLICATION OF THE KANSAS LONG ARM STATUTE

In the instant case, service of process was obtained on defendant Superior Overseas pursuant to Rule 4(e), Fed.R.Civ.P., and the Kansas long-arm statute, K.S.A. § 60–308(b) (1976), which in pertinent part reads:

"Any person . . . who in person or through an agent or instrumentality does any of the acts hereinafter enumerated thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

(1) The transaction of any business within this state;

(5) Entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state."

The Kansas Supreme Court has repeatedly held that the statute reflects a conscious state policy to assert jurisdiction over non-resident defendants to the extent permitted by the due process clause of the Fourteenth Amendment. *White v. Goldthwaite*, 204 Kan. 83, 460 P.2d 578 (1969); *Woodring v. Hall*, 200 Kan. 597, 438 P.2d 135 (1968). That same court has found that the 1971 legislative amendment to the long-arm statute, which added the above provision at subsection (b)(5), meant to broaden the effect of the judicial construction given to the (b)(1) definition of "transaction of business." *Misco-United Supply, Inc. v. Richards of Rockford, Inc.*, 215 Kan. 849, 852, 528 P.2d 1248 (1974).

■ This Court specifically finds that Superior Overseas by itself falls within the ambit of subsection (b)(5). Superior Overseas has entered into a contract which calls for partial performance by both parties in the state. Superior Overseas is required under the Main Agreement to mail notice into Kansas to Clinton International. The various notice and default provisions of the contract contemplate communication with Clinton International in Kansas. The Court agrees that this does not constitute substantial performance in Kansas, but the statute does not require as much.

This Court notes that this may be a more expansive reading of subsection (b)(5) than that previously given it by any state court. But see *Prather v. Olson*, 1 Kan.App.2d 142, 146, 562 P.2d 142 (1977). Defendants impliedly argue that the statute's reach ought to go no further than to those claims that arise from the contractual performance contemplated in Kansas. In the instant case, the breach for which plaintiffs bring the first of their two counts is defendants' alleged failure to perform in conformity with majority interest holders' desires for North Sea development—performance likely contemplated in Texas and in England. It is unclear at this early stage of the proceedings whether any of plaintiffs' claims arise out of performance contemplated in Kansas.

■ Defendants would thus interpret subsection (b)(5) to authorize service on non-residents only when they enter with a Kansas resident into a contract that calls for partial performance in the forum, which performance gives rise to the plaintiffs' claim. Under this interpretation, subsection (b)(5) would not reach Superior Overseas on the instant contract. The statute, however, literally authorizes service on a non-resident as to any claim that arises "from the doing of . . . said act,"— namely, the act of entering into a contract that calls for partial performance in Kansas by either party. There is nothing in the literal terms of the statute that would restrict its breadth as Superior Overseas would suggest.

The Court instead understands Superior Overseas' argument to bear upon the constitutional application of the statute on the instant facts. Concededly, the exercise of jurisdiction is more tenuous when a non-resident is sued in this forum for its failure under a contract to perform in another distant location. When a contract calls for a

non-resident's performance solely outside the forum, and when the non-resident's only contact with the forum is the act of entering a contract, the relationship of the non-resident with the forum is remote. The constitutional exercise of jurisdiction is limited under these circumstances. A non-resident's promise of performance in the forum state might, of course, render fair the exercise of jurisdiction over the non-resident, but it is not necessary. Substantial contacts of the non-resident, even if unrelated to the plaintiffs' claim, may be sufficient in certain contexts. See, *e. g., Perkins v. Benquet Consolidated Mining Co.*, supra.

The Court cannot read into subsection (b)(5) a legislative intent to authorize service only on non-residents who are called into Kansas on claims for breach of contract that arise in the forum. A recent Kansas case has impliedly rejected that interpretation. See *Prather v. Olson*, supra. The statute purports to reach any non-resident with a given relationship to the forum—being party to a contract that itself has some relationship to the forum. As in the present case, factors may exist, other than a promise of performance in the forum under the contract, that render it not inconsistent with traditional notions of fair play and substantial justice to require a defendant to answer here. This factor's limiting effect on the exercise of jurisdiction under this subsection has been considered by this Court in its weighing all factors under the *International Shoe* test. It is not controlling here.

The Court further finds that Superior Overseas has, "through an agent or instrumentality," transacted business in the state by virtue of the lengthy and extensive negotiations undertaken by the parent corporation on its behalf. The Court in *Woodring v. Hall*, supra, defined the transaction of business to include an individual who enters the state and attempts to effectuate a purpose to improve his economic conditions and satisfy his desires. Prior decisions have indicated that some activity in the forum, either by *or on behalf of the defendant*, is necessary to satisfy this section. See Casad, *Long Arm*, supra, at 27, and cases

therein cited. The statute authorizes service on anyone who does so through the use of an "agent or instrumentality." Superior Overseas urges this Court to read into "agent or instrumentality" the strict corporate definitions generated in the alter ego tradition. Superior Overseas argues that unless facts are established sufficient to pierce the corporate veil, the statute cannot extend service to a corporation that through an affiliated corporation transacts business in the forum. The Court finds this argument untenable.

The Kansas Court, of course, is the ultimate interpreter of Kansas statutes. *Goldsmith v. Cheney*, 447 F.2d 624 (10th Cir. 1971); *Security National Bank v. Republic National Life Ins. Co.*, 364 F.Supp. 585 (S.D. N.Y.1973). Yet no state cases have been found that deal expressly with the questioned statutory language as applied to affiliated corporations. *Farha* was not a long-arm case, but one where service was issued pursuant to the corporation statutes that authorize service on corporations "doing business" in the forum. It provides no guidance here. See *Farha v. Signal Companies, Inc.*, supra, modified 217 Kan. 43, 535 P.2d 463 (1975).

Reason compels a broader construction of the statute than urged by Superior Overseas. If the statute authorizes service, as Superior Overseas contends, no further than an alter ego corporation, then the term "instrumentality" is mere surplusage. By piercing the corporate veil, the Court could extend service to the controlling corporation solely by virtue of the Court's authority to authorize service on the "instrumentality" corporation that performed the acts in Kansas. The statutory language "any person who transacts business" would alone suffice to authorize service on "any person who transacts business through an alter ego." The statutory "instrumentality" must therefore embrace more.

The Kansas Supreme Court has expressed its understanding that the long-arm statute should be construed in its "broadest logical sense . . . intending to authorize

. . . personal service . . . upon a corporate or individual defendant to the full extent of the due process clause." See *Woodring v. Hall*, supra, 200 Kan. at 606, 438 P.2d at 144. The general view has also been expressed that the statutory language should be construed broadly and that no case should be ruled outside the scope of the statute unless by no reasonable construction of the language could it be said to fall within the statute's terms. See Casad, *Long Arm*, supra, at 45. The statutory language has most recently been interpreted to reach a non-resident whose co-conspirator foreseeably commits one of the enumerated acts in the forum. *Professional Investors Life Ins. Co. v. Roussel*, 445 F.Supp. 687 (D.Kan.1978).

■ This Court believes that it must read the statute broadly to reach a non-resident that through any instrumentality transacts business in Kansas. The Kansas statute falls short of providing a means of service on any entity that owns or is owned by a corporation otherwise subject to service in Kansas. This Court construes the statute, however, to authorize service on a non-resident that has controlled or directed those acts of the instrumentality that give rise to plaintiffs' claim. Alternatively, the statute authorizes service on a non-resident that purposefully seeks and foreseeably benefits from its active relationship with another entity that has transacted business in the forum that gives rise to plaintiffs' claim. Compare *Professional Investors Life Ins. Co. v. Roussel*, supra. The Court finds this element of direction or actively sought, foreseeable benefit sufficient to establish that the non-resident has, through the instrumentality of another, transacted the business that gives rise to plaintiffs' claim.

This interpretation comports with the liberal application of the statute that gives it the broadest possible reach under the due process clause. This interpretation also has the practical benefit of avoiding an often vexatious problem of corporate law. It precludes the Court from engrafting onto the jurisdictional reach of the Kansas long-arm statute the corporate law determination of whether a corporation is merely an alter ego, dummy or sham corporation for another, an analysis that is frequently unpermitting of intelligent or accurate formulation. See Latty, *Subsidiaries and Affiliated Corporations*, 156–191 (1936). It further segregates jurisdictional analysis from the corporate problem that bears no necessary relationship to the separate question of the fairness or reasonableness of requiring a non-resident defendant to answer in the forum.

Consistent with these standards the resolution of the statutory question under subsection (b)(1) is clear. Superior traveled to Kansas and conducted extensive negotiations with parties in Kansas, fully intending to effectuate its ultimate goal through the use of its subsidiary. The officer of Superior present in Kansas for the negotiations was also the president of the subsidiary ultimately to receive the benefit of the negotiations. Superior itself imposed obligations on Superior Overseas as a result of those negotiations. Superior agreed in its contract to "cause its subsidiary" to perform certain functions. By virtue of its parent's letter agreement, Superior Overseas assumed the duty to perform obligations undertaken by Superior "for and on [its] behalf." This alone would be arguably sufficient for a finding of agency that would bring Superior Overseas within the "doing business" holding of the Tenth Circuit in *Curtis Publishing Co. v. Cassel*, supra, and render proper the statutory issuance of service.

■ This Court finds no need to reach that issue. Superior has foreseeably engaged in activities in the forum on behalf of its subsidiary. Through negotiations with substantial connection to Kansas, Superior has sought contractual arrangements that were intended to involve Superior Overseas, and which Superior Overseas certainly understood would involve itself, with the plaintiff corporations in Kansas. The benefits from Superior's transaction of business here have foreseeably accrued to Superior Overseas. Superior Overseas cannot be heard to argue that it was uninvolved in the

business in Kansas. Superior Overseas, therefore, has "transacted business" in this forum through a corporate instrumentality.

■ The only remaining question is whether the exercise of jurisdiction over Superior Overseas in this forum offends traditional notions of fair play and substantial justice. This Court finds that it does not. The issues before the Court on the merits in this action are largely ones of contractual interpretation and substantial performance under the contracts in question. The parties who negotiated both contracts are officers of their respective corporations located in Kansas and Texas. Superior Overseas' parent corporation does extensive business in Kansas and the same counsel represent both defendant corporations. Superior Overseas has failed to demonstrate any factor which might indicate substantial inconvenience to itself if the litigation were to proceed in this forum.

The relationship of Superior Overseas with this forum involves few physical contacts. The physical contacts of its parent, which culminated in both contracts sued upon, are, however, quite substantial. Superior Overseas' sole physical contact—its Main Agreement contract mailed into the forum—might alone be insufficient to support jurisdiction, for although it gives rise to plaintiffs' claim, it arguably lacks the substantial relationship with the forum necessary to sustain jurisdiction predicated on subsection (b)(5). See *Pedi Bares, Inc. v. P & C Food Markets, Inc.*, 567 F.2d 933 (10th Cir. 1977); *Misco-United Supply, Inc. v. Richards of Rockford, Inc.*, supra. When supported by the relevant relationship of the instrumentality employed to reach the contract, jurisdiction under (b)(5), as well as (b)(1), seems both fair and proper. The nature and quality of the subsidiary's relationship with the forum through its parent are substantial and significantly give rise to the obligations upon which the plaintiffs bring suit.

The strongest considerations compelling this Court to find fundamentally fair the exercise of personal jurisdiction are those relating to "the fair and orderly administra-

tion of the laws which it was the purpose of the due process clause to insure." The contract claim between both parent corporations is clearly litigable in this forum. That contract specifies the performance of obligations imposed on each subsidiary, both under the subsidiaries' contract and under the contract between the parents. The contract further guarantees the subsidiaries' performance. If this Court refused to exercise personal jurisdiction over Superior Overseas, it would bifurcate this litigation, doubling the judicial time, effort and expense which the litigation would entail. Because the litigation of the parents' contract necessarily involves an interpretation of the subsidiaries' contract and a ruling on their substantial performance, bifurcation might further produce inconsistent judicial results.

■ Plaintiffs conceivably could have brought this action in Nevada, where both defendant corporations are incorporated, but that choice of forum would be less related to the litigation than Kansas. Plaintiffs might also pursue Superior Overseas to Texas. Counsel for defendants argue that the litigation ought properly to be pursued in the United Kingdom. The courts of this country, however, have a substantial interest in providing a forum for litigation by American corporations of issues that arise out of contracts entered into in this country under the protection of this country's laws. Plaintiffs are not required to choose the forum with the "best contacts," but only one where the requisite minimum contacts exist. *Shaffer*, supra, 433 U.S. at 228, 97 S.Ct. at 2593 (Brennan, J., concurring and dissenting in part). This Court feels that plaintiffs have satisfied their burden. The motion of Superior Overseas to dismiss for lack of personal jurisdiction must be denied.

## SUBJECT MATTER JURISDICTION

■ At the hearing on Superior Overseas' motion to dismiss, defendant Superior renewed its motion pursuant to Rule 12(b)(1), Fed.R.Civ.P., to dismiss the action for lack of subject matter jurisdiction. Su-

perior initially claimed subject matter jurisdiction was lacking because this was not the forum wherein performance of the contract was contemplated. Superior argued that without a more substantial nexus to this forum, the lawsuit was not properly litigable here. The Court noted in its Order of January 5, 1978, that subject matter jurisdiction existed by virtue of Section 1332(a)(1) of Title 28, United States Code, which places in the district courts original jurisdiction of all civil actions where the matter in controversy exceeds $10,000 and where the parties are citizens of different states. Superior challenged neither the diversity of the parties nor the jurisdictional amount. The motion was then denied. Superior now asserts that this action is a local action contesting title to real property and that subject matter jurisdiction exists only in that jurisdiction where the real estate is located. The Court finds this argument equally without merit.

The action before the Court is one for a declaratory judgment of the termination of a contract, either through material breach or cancellation by its own terms. The litigation requires a determination of the rights and duties of the various parties under agreements between themselves to share in the development of, and proceeds from, an oil operation in the North Sea. The title to the offshore license is not in dispute. The right to proceeds from the development of that license is in dispute, not because of a dispute over the ownership of the license interest, but because of a dispute over the contractual provisions that divide among the parties the proceeds flowing from the development of the license as presently owned. This Court cannot agree with Superior's contention and its motion must be denied.

IT IS THEREFORE ORDERED that the motion of Superior Overseas Development Company Ltd. to dismiss for lack of personal jurisdiction is hereby denied.

IT IS FURTHER ORDERED that the motion of Superior Oil Company to dismiss the action for lack of subject matter jurisdiction is hereby denied.